THOMAS HUFF, Plaintiff-Appellant, v. ELMHURST-CHICAGO STONE CO., Defendant-Appellee.—(MEDUSA CEMENT CO., Defendant.)

First District (2nd Division)    No. 80-1547

Opinion filed March 31, 1981.

Richard C. Valentine, of Chicago (Michael W. Rathsack, of counsel), for appellant.

Baker & McKenzie, of Chicago (Francis D. Morrissey, Thomas F. Tobin, and Paul B. O'Flaherty, Jr., of counsel), for appellee.

Mr. PRESIDING JUSTICE HARTMAN delivered the opinion of the court:

Plaintiff Thomas Huff seeks to set aside the trial court's order directing a verdict for defendant Elmhurst-Chicago Stone Company (hereinafter Elmhurst) at the conclusion of plaintiff's case. Medusa Cement Company, also made a defendant in this case, was dismissed upon stipulation of the parties also at the close of plaintiff's case and is not a party to this appeal. Plaintiff sought damages for personal injuries on the theories of negligence and products liability in tort, claiming that he was burned while spreading liquid concrete manufactured by Elmhurst. The issue raised on appeal is whether plaintiff made a sufficient showing that the product Elmhurst distributed was unreasonably dangerous and whether there was sufficient evidence to demonstrate that defendant failed to furnish sufficient and adequate warning of that condition so as to survive a motion for directed verdict. For the reasons which follow, we affirm.

Plaintiff testified that he had been a concrete crew laborer for 18 years up until the time of the accident. He spread concrete from a hose attached to pumping machinery with the aid of an assistant. On April 21, 1975, liquid concrete splashed on his clothing and into his protective boots. He noticed nothing unusual about the concrete and had previously had his trousers soaked hundreds of times, which had remained wet from seven to eight hours, but had never suffered adverse effects from the wet concrete on those occasions. He was wearing the same type of clothes that day as he had on the previous occasions. He worked continuously from 8 a.m. to 2:30 p.m., and at 12:30 p.m. was offered protective rubber pants which he declined. At the end of the work day, when he had returned home and removed his clothing, he discovered that he had sustained burns on both legs. He was hospitalized for 45 days and required skin grafts. Elmhurst stipulated that the burns were caused by the concrete.

Plaintiff called John Maurus, an analytic chemist and employee of Pan Technic, Inc., a firm of consulting scientists and engineers. He took a 50-gram sample of the concrete that had been obtained from the location of plaintiff's work, pulverized it and mixed it in 50 milliliters of water which he had agitated for 72 hours. When he measured the alkalinity of

the mixture with a pH meter, he observed a reading of 11.70. He found further calculations necessary because the amount of water added to the sample was an arbitrary measure which did not reflect the amount of water used in the original mixture. He admitted that he did not know in what state of liquidity the concrete was kept at the job site, although this factor would have affected the pH level. Dry concrete has no pH level. Other aspects of his testimony will be set forth later in the opinion. Elmhurst moved to strike Maurus' testimony as being incompetent and based upon improper elements. The trial court took the motion under advisement pending further evidence and made no ultimate ruling with respect to this motion.

Plaintiff next called Charles Fiene, general manager of Elmhurst's Ready-Mix Division, who was familiar with the manufacturing and distribution of concrete products and had been involved with that industry for approximately 18 years. He described the mixing process of the concrete and quality control procedures employed. Visual dials are utilized in order to permit plant operators to check quantities of concrete components mixed at the plant. A quality control department takes samples of concrete and measures precise volumes and weights of its components in order to establish proper composition. He knew of no complaints received by Elmhurst for concrete produced on the day in question other than that registered by plaintiff. A pH value of between 12 and 13 was reasonable, normal and customary for concrete involved in the accident, in his opinion. He knew of the inherent alkalinity of wet concrete which rendered it a caustic substance and expressed the opinion that it can be a dangerous material to handle if proper protective measures are not taken. Based upon his experience, it is common knowledge in the construction industry that wet concrete can cause burns to the skin; such knowledge is the reason that concrete workers normally wear protective clothing.

Fiene further testified that the concrete delivery trucks bore no warning signs or labels and the only warning given by Elmhurst was contained on the delivery ticket, copies of which went to Elmhurst's office, the driver, the deliverer, the engineer and the customer. The warning, set in standard type near the bottom of the ticket, stated: "Avoid Contact of Skin with Wet Cement in Concrete."

Plaintiff also called Dr. Arthur Krawetz, a consulting chemist with 21 years experience. He had conducted chemical analyses of concrete at least one dozen times prior to this case. He had specifically tested concrete samples for their alkalinity on two or three previous occasions. In his opinion, the normal pH factor of wet concrete was in the approximate range of 12 to 13.

At the close of plaintiff's case, both defendants moved for directed

verdicts. It was at this point that Medusa Cement Company was dismissed from the case by agreement, and the trial court granted Elmhurst's motion for a directed verdict.

## I.

Plaintiff contends that the evidence adduced at trial established directly and by inference that the concrete supplied by Elmhurst was abnormally caustic and contained an inordinate amount of sodium oxide in the sample taken from the construction site. He argues that the danger of a material with a pH of 12.77, as shown by plaintiff's expert Maurus, is evident from testimony that pH is measured on a scale of from 1 (acid) to 14 (alkaline), with 7 reflecting a neutral element like tap water. A reading of 12.77 is exceptionally high, plaintiff claims, because the normal pH of concrete, according to Maurus, is 8 to 10. The pH measurement scale is logarithm based, which means that a pH of 9 is 10 times more alkaline and thus 10 times more caustic than a pH of 8, and concrete with a pH of 12.77 is 5,000 times more caustic than concrete with a pH of 9. The subject concrete, therefore, was defective because of its abnormally high pH and did not "perform" in the manner reasonably expected by plaintiff, citing *Dunham v. Vaughan & Bushnell Mfg. Co.* (1969), 42 Ill. 2d 339, 342-43, 247 N.E.2d 401, 403.

Elmhurst observes that a product is not unreasonably dangerous merely because it is capable of causing harm since there are some products which are incapable of being made safe for their intended and ordinary use, citing 2 Restatement Second of Torts, section 402A, comment *k*, at 353 (1965). Accordingly, Elmhurst maintains, strict liability cannot and does not impose a duty upon manufacturers to produce products incapable of causing injury nor does a manufacturer become an insurer of all accidents involving his products, citing *Genaust v. Illinois Power Co.* (1976), 62 Ill. 2d 456, 343 N.E.2d 465, and *Hunt v. Blasius* (1978), 74 Ill. 2d 203, 384 N.E.2d 368.

As Elmhurst notes, Illinois has no recorded decision considering whether concrete is unreasonably dangerous by virtue of its capacity for causing burns while in its liquid state. The question has been considered in cases decided by other jurisdictions. In *Simmons v. Rhodes & Jamieson, Ltd.* (1956), 46 Cal. 2d 190, 293 P.2d 26, plaintiff, a welder by trade, was constructing his own home, and suffered severe burns as a consequence of using ready-mixed cement purchased from defendant. He sued for breach of warranty and for negligence. The trial court granted a nonsuit (dismissal) at the close of plaintiff's case, which was affirmed on appeal. The supreme court of California observed that the injury occurred in the handling of a standard and common commodity, quicklime, a caustic

element that caused the burns. The court recognized that quicklime was a necessary ingredient of concrete and that plaintiff there was familiar with the caustic quality of wet concrete. In *Katz v. Arundel-Brooks Concrete Corp.* (1959), 220 Md. 200, 151 A.2d 731, plaintiff, an unemployed mechanic, sustained third-degree burns while working with wet concrete that had been mixed and sold by defendant. Plaintiff brought an action for negligence and breach of warranty based upon the proposition that concrete was an excessively dangerous product. The Maryland Court of Appeals rejected plaintiff's theory, noting that concrete is a common product that has been in use for many years. Its hazards were well known; yet, it was perfectly safe to use when normal precautions are taken against prolonged application to the skin. In *Baker v. Stewart Sand & Material Co.* (Mo. App. 1961), 353 S.W.2d 108, plaintiff, a real estate salesman, sought damages for burns and contact dermatitis sustained in the use of ready-mix concrete manufactured by defendant. The court there also acknowledged decisions from other States and observed that it was common knowledge that cement contains lime and that lime is caustic. A jury verdict for plaintiff there was set aside by the trial court and affirmed on appeal. In *Dalton v. Pioneer Sand & Gravel Co.* (1951), 37 Wash. 2d 946, 227 P.2d 173, the plaintiff sustained third-degree chemical burns on both knees necessitating skin grafts. The court ruled that knowledge of prospective injury from contact with wet concrete was neither limited to experts nor beyond the ken of laymen generally and affirmed a judgment for defendant entered at the close of plaintiff's case.

From the foregoing authorities and the evidence in this case we conclude that the caustic properties of wet concrete are matters of common knowledge; its propensities to burn upon prolonged contact with the skin are equally well established; and that it is safe for use when proper precautions are taken to avoid such contact. The question then arises as to whether there was sufficient evidence to support present plaintiff's thesis that the wet concrete was in such an unusual or unreasonably dangerous condition that sustaining burns after prolonged contact with it should not have been within his contemplation. Plaintiff maintains that the testimony of his witness Maurus must be considered and that the question of his credibility and weight to be given his testimony was uniquely for the jury and should not have been decided by the court in granting the motion for a directed verdict, citing *Clark v. Crane Carrier Co.* (1979), 69 Ill. App. 3d 514, 516, 387 N.E.2d 871, and *Anderson v. General Grinding Wheel Corp.* (1979), 74 Ill. App. 3d 270, 281, 393 N.E.2d 9. He insists that such evidence also raised an unrebutted inference that the concrete was abnormally caustic, particularly since there was evidence that plaintiff had poured concrete for 18 years in the

same manner followed on the day of the injury. Despite having been frequently splashed with liquid concrete which wet his clothing, in his entire career as a laborer he had never experienced burns.

Elmhurst argues that neither plaintiff's direct nor circumstantial evidence supports a finding that its concrete was defective, bottomed upon the assertion that plaintiff's suggested pH figure of 12.77 of the subject concrete was riddled with speculation and conjecture; and, accepting *arguendo* that the figure was correct, the record overwhelmingly demonstrated that such a pH was normal for wet concrete notwithstanding plaintiff's suggested normal figure of from 8 to 10, for which there was no basis in the record.

The linchpin of plaintiff's expert evidence was the testimony given by Maurus which sought to establish the pH factor of the concrete involved in plaintiff's accident. Maurus had testified that the pH of the subject concrete was 12.77, a high alkaline reading on a scale of 14. That figure was reached by taking a dry sample of concrete from the locale of the accident, one year after it was poured, on which a test was conducted using a 50-gram sample by pulverizing the sample, agitating it in 50 milliliters of water for 72 hours and measuring the pH of the water solution with a precision pH meter that revealed the figure 11.70. Maurus then recalculated that figure for the purpose of determining the pH of the concrete at the time of the accident which purported to reveal the 12.77 figure upon which plaintiff relies. After one year, there could have been no access to wet concrete under the conditions of the accident; the concrete tested was a dry substance which all agree has no pH measurement at all. In order to secure a pH reading, water or some other liquid must be added. Maurus conceded that he knew little about the conditions under which the sample had existed between the date of the accident and its delivery to him, except that it had been in an open yard, which led him to believe that the pH potential of such a substance would decline with weathering and aging. He also conceded, however, that weathering would wash away not only alkaline factors but anything else subject to solution and he would have to know which components had weathered away in order to ascertain whether the pH of the sample had increased or decreased between the accident and the test.

The dry concrete sample utilized by Maurus was substantially insoluble in water despite agitation over the 72-hour period, and lumps of concrete settled to the bottom of the glass container. Maurus did not conduct any tests on the concrete lumps in the solution, but only on the water solution itself. He also testified that the amount of water he added to the concrete was an arbitrary amount and could have been 100 milliliters or 10 but that he decided on 50 which is "* * * not a realistic amount because it doesn't reflect what is mixed by the mixer—the

commercial mixer of the concrete." If more water had been added, a lower pH reading would have been obtained; conversely, if less water has been added a higher pH reading would have been obtained. The amount of water employed in the test was the explanation for finding the pH factor of 11.70. In addition, the pH of the water itself before it was added to the concrete would have had to have been determined to have calculated the alkali content of the concrete with which it was put into solution. Maurus claimed that he was given some unspecified figures concerning the water and the concrete on the day of plaintiff's accident but did not know whether water was added to the concrete mixture at the job site, nor did he know whether the viscosity of concrete had changed the pH factor of the wet cement when poured.

Further weakening Maurus' testimony was his admission that he did not know the chemical components of Portland cement which was used in the mixture, or its pH factor; nor was he aware of the chemical content or alkali level of the sand and stone used in the concrete and was unaware of the differences between various types of sand. He had not tested for the alkaline content of any of those component materials. He had no knowledge of how much lime was required with other components to cause cement to set, although he conceded that lime would be an additional alkaline factor in concrete. He acknowledged that the foregoing factors would have a bearing on the alkaline content. Maurus conceded that he was not an expert on cement and his professional affiliations are unrelated to concrete or building materials, nor was he conversant with recent publications of the American Society of Testing and Materials dealing with concrete. He did not know whether concrete requires a pH in excess of 12 in order to set and had analyzed only one piece of concrete for pH in his entire professional career.

■■ The foregoing deficiencies and unsupported assumptions relate to plaintiff's contention that the pH factor of 12 to 13 is abnormally high and that the standard pH of wet concrete should be between 8 and 10. Maurus' opinion in this regard was based upon a survey of certain literature and "* * * several individuals who have some kind of expertise." He conceded, however, that none of the sources established a standard for the normal pH value of wet concrete; neither did the treatises he consulted nor the individuals upon whose opinions he relied, who, he suggested, may not have actually known what they were talking about. In contrast, Fiene's 18 years experience in dealing with concrete led him to the opinion that a pH factor of between 12 and 13 is common and normal for wet concrete. Dr. Krawetz, a consulting chemist for 21 years, who had performed chemical analyses of concrete on at least 12 occasions prior to this case, also agreed that the normal pH factor was in the approximate range of 12 to 13. From the foregoing, it is clear that the testimony of

Maurus in this crucial area of the case was without basis or foundation and could not have supported a jury verdict for plaintiff. Under these circumstances, it was proper for the trial court to direct a verdict for defendant. (*Mullen v. General Motors Corp.* (1975), 32 Ill. App. 3d 122, 134, 336 N.E.2d 338; *Belleville National Savings Bank v. General Motors Corp.* (1974), 20 Ill. App. 3d 707, 313 N.E.2d 631.) Whatever scintilla of probative force may have been attributable to Maurus' opinion, that spark was extinguished in light of plaintiff's other evidence given by Fiene and Dr. Krawetz so that only one verdict was possible, that for Elmhurst in this case. We find no error in the trial court's having directed the verdict in this factual setting. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 504-05, 229 N.E.2d 504.

■■ The circumstantial evidence upon which plaintiff relies, namely, that he was injured on this occasion but not on other occasions when working with wet concrete, thereby raising an inference that Elmhurst's concrete was abnormally high in alkalinity and therefore unreasonably dangerous, is also unsupportable in law. An inference of defectiveness may not be drawn from the mere fact of injury. (*Mullen v. General Motors Corp.*; *Larson v. Thomashow* (1974), 17 Ill. App. 3d 208, 220, 307 N.E.2d 707.) The similarities of conditions during which plaintiff was not injured to those which obtained on the date of injury are absent in this case. He had testified that on some of the other occasions, the liquid concrete that splashed on him had dried out. As the uncontroverted evidence demonstrated, when dry, concrete is not alkaline and will not burn. On the occasion of the accident, plaintiff was wet continuously, particularly inside his protective boots where wet concrete was accidentally splashed. Plaintiff normally wore protective boots to keep dry.

## II.

Plaintiff next claims that Elmhurst failed to sufficiently and adequately warn of the extreme caustic property of the concrete and that despite Elmhurst's knowledge of that characteristic, the delivery trucks carried no warning, and no written or oral warning was otherwise given to plaintiff. Plaintiff points to what he deems an implicit admission that a warning was necessary under these circumstances by virtue of the phrase, "Warning—Avoid Contact of Skin with Wet Cement in Concrete," set forth on the delivery tickets. Plaintiff disclaims knowledge of the alleged extremely caustic nature of the concrete of which defendant was aware and urges that this created a question of fact for the jury to decide, quoting from *Fuller v. Fend-All Co.* (1979), 70 Ill. App. 3d 634, 638, 388 N.E.2d 964. Even if the concrete was not abnormally caustic, plaintiff maintains that Elmhurst had a duty to warn of the dangers attending the use of the concrete. The issue here, he claims, is not whether a duty to

warn exists under these factors, which was mooted by Elmhurst having provided a warning on the delivery ticket, but the adequacy and sufficiency of the warning, the determination of which is the prerogative of the jury, citing *Mahr v. G. D. Searle & Co.* (1979), 72 Ill. App. 3d 540, 562, 390 N.E.2d 1214. Because the adequacy of the warning is measured by its form, specificity and likelihood of reaching the user of the product, the warning at issue failed on all three counts. This is so, plaintiff maintains, because defendant's warning was placed on the bottom of the delivery ticket in small print, was difficult to read, did not draw the attention of the reader, and did not inform its reader that severe burns would result if the reader or his clothing contacted the liquid concrete. Finally, plaintiff asserts, the warning was not calculated to reach the ultimate user since the delivery ticket is not meant to be given to construction workers. Plaintiff concludes that by virtue of the foregoing a prima facie case was proven and the entry of a directed verdict at the close of his evidence was error.

■■ Plaintiff had testified that during the course of his 18 years as a concrete worker, he had learned that wet concrete could burn human skin. Six years before his accident he had witnessed an accident in which a man immersed in wet concrete to his neck had suffered burns by reason of its contact. He also testified that he wore protective boots to keep dry and thereby prevent burning of his feet. There was further evidence in the record that it was common knowledge in the construction industry that wet concrete can cause burns to the skin and for this reason concrete workers normally wore protective clothing. It is ineluctable from the foregoing evidence that plaintiff had actual knowledge of the risk of burning by wet concrete on the date of the accident. The cases have uniformly held that the purpose of a warning is to apprise a party of danger of which he has no knowledge and thereby enable him to take measures which will protect him against those dangers; however, when a danger is obvious and generally appreciated, nothing of value is had by a warning and none is required under those circumstances. (*Genaust v. Illinois Power Co.* (1976), 62 Ill. 2d 456, 467, 343 N.E.2d 465; *Peterson v. B/W Controls, Inc.* (1977), 50 Ill. App. 3d 1026, 1032, 366 N.E.2d 144; *Jonescue v. Jewel Home Shopping Service* (1973), 16 Ill. App. 3d 339, 345, 306 N.E.2d 312.) The trial court correctly ruled under the circumstances of this case that the existence of a duty to warn, which is normally a question of law in the first instance (*Genaust v. Illinois Power Co.* (1976), 62 Ill. 2d 456, 466), did not arise because of general knowlege in the industry concerning the causticity of wet concrete, of which this plaintiff had actual knowledge, and because plaintiff had suffered an injury as a result of a common propensity of the product with which he was familiar. To the same effect are *Simmons v. Rhodes & Jamieson, Ltd.* (1956), 46

Cal. 2d 190, 200, 293 P.2d 26, 29; *Katz v. Arundel-Brooks Concrete Corp.* (1959), 220 Md. 200, 204-05, 151 A.2d 731, 733-34; *Baker v. Stewart Sand & Material Co.* (Mo. App. 1961), 353 S.W.2d 108, 111; and *Dalton v. Pioneer Sand & Gravel Co.* (1951), 37 Wash. 2d 946, 947-48, 227 P.2d 173, 174-75.

Neither *Fuller v. Fend-All Co.* nor *Mahr v. G. D. Searle & Co.*, upon which plaintiff relies, is of aid to him. In *Fuller*, there was sufficient evidence adduced concerning the absence of knowledge attributable to that plaintiff concerning the potential dangers associated with the use of the safety glasses there under consideration. In *Mahr*, there was no evidence that decedent ever knew or could have known of the dangers attendant to the use of the drug Enovid. In the present case, plaintiff was well aware of the burning propensities of wet concrete upon prolonged contact with the skin. There was no disputed question of fact in this regard requiring submission of this issue to the jury.

Under the foregoing circumstances, we are compelled to conclude that no error was committed by the trial court in directing the verdict for defendant Elmhurst at the close of plaintiff's case, and we must accordingly affirm.

Affirmed.

DOWNING and PERLIN, JJ., concur.