JEFFREY JACKSON et al., Plaintiffs, v. RELIABLE PASTE AND CHEMICAL COMPANY, Defendant and Third-Party Plaintiff-Appellant (Technical Petroleum Company et al., Third-Party Defendants-Appellees).

First District (5th Division)   No. 83—2641

Opinion filed September 13, 1985.

Taylor, Miller, Magner, Sprowl & Hutchings, of Chicago, for appellant.

Lord, Bissell & Brook, of Chicago, for appellees.

JUSTICE PINCHAM delivered the opinion of the court:

Plaintiffs, Jeffrey Jackson (Jackson) and Irving Zamost (Zamost), were injured on their job at the Midwest Glass Company (Midwest) by an explosion of shellac solvent used by Jackson to cut glass.[1] Midwest purchased the shellac solvent from N. Turek & Sons, a hardware store, which had purchased it from Reliable Paste and Chemical Company (Reliable). Reliable made the shellac solvent from methanol, which it purchased in bulk quantities from three suppliers, two of whom were defendants Technical Petroleum Company (Technical) and Ashland Chemical, Inc. (Ashland).[2]

Jackson and Zamost filed an action in negligence and strict liability against Reliable and alleged that the can of Reliable shellac solvent was in an unreasonably dangerous condition and that the label on the can did not contain adequate warnings and instructions. Reliable filed an action against two of its bulk methanol suppliers, Technical and Ashland, for indemnification on the ground that they were strictly liable for their failure to warn Reliable of the dangerous explosive and flammable propensities of methanol.

Technical and Ashland filed motions for summary judgment in which they contended, *inter alia*, that they did not owe a duty to warn Reliable of the dangerous explosive and flammable propensities of methanol because Reliable was fully aware of the dangerous characteristics of methanol and because Reliable was responsible for packaging and properly labeling its own product. The trial court ruled that Technical and Ashland did not owe a duty to warn Reliable of the dangers of methanol and entered summary judgment in favor of Technical and Ashland. Reliable appeals. The record reveals the following uncontroverted facts.

On July 24, 1978, while at work at the Midwest Glass Company, plaintiff Jeffrey Jackson used a gallon can of Reliable shellac solvent to cut glass. Plaintiff Irving Zamost, another Midwest employee, was nearby. Midwest had instructed its employees on the procedure in using the Reliable shellac solvent. The solvent was poured on glass and

---

[1] Plaintiff Linda Jackson alleged that she was the wife of Jeffrey Jackson and that she was entitled to damages for loss of consortium due to her husband's injuries.

[2] Ashland's failure to file a brief or appear for oral argument of this appeal does not preclude us from deciding this appeal as to Ashland. *First Capitol Mortgage Corp. v. Talandis Construction Corp.* (1976), 63 Ill. 2d 128, 345 N.E.2d 493.

ignited to soften the glass so that the glass could be broken. Jackson and his supervisor, John Gordon, poured the shellac solvent on a piece of glass and ignited it as Zamost watched. The ignited solvent flamed rapidly with a "poof noise," and the flames rose five to six inches. After the flames subsided, the glass was still not pliable enough to break. Jackson tilted the can of shellac solvent to pour more solvent on the hot glass. The solvent ignited and the solvent can exploded and burned Jackson and Zamost.

Midwest had purchased the prepackaged gallon can of shellac solvent from N. Turek & Sons, a hardware store. N. Turek & Sons purchased the can of shellac from Reliable, who packaged, labeled and marketed it. The shellac solvent contained methanol, a chemical purchased by Reliable in bulk quantities from three methanol suppliers, two of whom were Technical and Ashland. Methanol is fungible and there was no difference in the quality or characteristics of the methanol delivered to Reliable by its three suppliers.

The methanol was delivered to Reliable in tanker trucks and pumped into Reliable's underground storage tanks. Because methanol is flammable and explosive, Reliable took safety precautions and attached the tanker and hose to its grounding lines to eliminate the possibility of static electricity or sparks when the methanol was pumped from a tanker truck to Reliable's storage tanks. Also, in accordance with the fire code, Reliable packaged the methanol in a building constructed with explosion-proof electrical wiring.

Reliable used the methanol from its storage tanks to package shellac solvent in one-gallon cans. It was undisputed that Reliable's president, Oscar Stirn, knew of the dangerous flammable and explosive propensities of methanol and the shellac solvent and that he knew the danger of allowing the shellac solvent or its vapors to come in contact with heat, sparks, flames or other ignition sources. Stirn designed the warning labels for Reliable's shellac solvent cans. He had a "working knowledge" of chemistry and had studied treatises and industry reports concerning the behavior of methanol when it was placed near heat or flames. Before he designed the warning labels for the Reliable shellac solvent cans, Stirn familiarized himself with the National Paint and Coating Association Labeling Guide, the Uniform Hazardous Substances Act, the Federal Consumer Product Safety Act, labeling regulations of the Consumer Product Safety Commission, the Paint, Varnish and Lacquer Association Standards, and the Hazardous Products Labeling Act.

Reliable's warning label on the front of the shellac solvent can was as follows:

"DANGER POISON

MAY BE FATAL OR CAUSE BLINDNESS IF SWALLOWED. FLAMMABLE. VAPOR HARMFUL. CANNOT BE MADE NON-POISONOUS. CONTAINS METHANOL."

This front warning label had a picture of a skull and crossbones between the words "Danger" and "Poison."

The label on the back of the can stated:

"PRECAUTIONS

Flammable. Cannot be made non-poisonous. Vapor harmful. Contains Methanol. Keep away from heat, fire and open flame. USE ONLY WITH ADEQUATE VENTILATION. Keep container closed. Avoid prolonged or repeated breathing of vapor or skin contact or contact with eyes. Do not transfer to unmarked containers.

Antidote: (First Aid) In case of contact with eyes, flush thoroughly with water. If swallowed, call doctor, hospital emergency room, or Poison Control Center immediately for instructions to induce vomiting. Do not use table salt solution. If available, use one tablespoon (½ ounce) of ipecac syrup for persons one (1) year of age or older, plus at least one cup of water. In either case CALL A PHYSICIAN.

KEEP OUT OF REACH OF CHILDREN."

Before this court, Reliable presents three issues for reversal of the trial court's summary judgment in favor of Technical and Ashland. The first issue is on the question of appropriating liability among alleged joint tortfeasors. The second issue is whether a bulk supplier of a product owes a duty to a repackager to warn of the dangers of the product. The third issue is whether the trial court erred in entering summary judgment because the record "demonstrated issues of material fact." In response, Technical contends that because Reliable was fully aware of the flammable propensities of the shellac solvent, Technical is not liable.

After a careful review of the record and facts presented in this case, we are convinced that the question of Technical and Ashland's duty to warn Reliable and Reliable's knowledge of the flammable and explosive propensities of its product are dispositive of this appeal. We therefore first address Reliable's contention that the trial court erred in entering summary judgment because, Reliable contends, whether Technical and Ashland had a duty to warn Reliable of the potential dangers and risks of methanol was a question of fact for the jury.

■ Summary judgment is appropriately entered when the pleadings, depositions, admissions, answers to interrogatories, affidavits

and the trial record establish that there is no genuine controversy of the material facts and that the movant is entitled to judgment as a matter of law. (*McCracken Contracting Co. v. R. L. DePrizio & Associates, Inc.* (1984), 122 Ill. App. 3d 680, 462 N.E.2d 682.) Our courts have also held that whether there is a duty to warn is a question of law and not of fact. (*Genaust v. Illinois Power Co.* (1976), 62 Ill. 2d 456, 466, 343 N.E.2d 465; *Holecek v. E-Z Just* (1984), 124 Ill. App. 3d 251, 254, 464 N.E.2d 696.) A manufacturer has no duty to warn about a product when its dangerous propensities are obvious and generally known. *Genaust v. Illinois Power Co.* (1976), 62 Ill. 2d 456, 467, 343 N.E.2d 465; *Curry v. Louis Allis Co.* (1981), 100 Ill. App. 3d 910, 916, 427 N.E.2d 254; *Huff v. Elmhurst-Chicago Stone Co.* (1981), 94 Ill. App. 3d 1091, 1099, 419 N.E.2d 561.

In *Curry v. Louis Allis Co.* (1981), 100 Ill. App. 3d 910, 427 N.E.2d 254, plaintiff brought suit for injuries he suffered when a motor, having been improperly installed, fell off a drop hammer. The defendants were the manufacturer, the seller and the assembler of the total machine. The trial court concluded that the manufacturer and the seller were not liable for the injuries and granted their motion for summary judgment. Affirming the summary judgment, the appellate court held:

> "The plaintiff's allegation that the [defendants] failed to warn that the motor frame was of insufficient strength to withstand vibrations of the drop hammer is without merit *because \*\*\* both [the assembler] Ceco and [plaintiff's employer] Cornell were fully aware of the need for proper installation. Accordingly, [the manufacturer] Allis and [the seller] Central had no duty to warn them of a fact which was already apparent.*" (Emphasis added.) 100 Ill. App. 3d 910, 916.

In *Huff v. Elmhurst-Chicago Stone Co.* (1981), 94 Ill. App. 3d 1091, 419 N.E.2d 561, plaintiff Thomas Huff, a concrete worker, brought an action against the concrete manufacturer for burns he received while spreading liquid concrete. At trial, Huff testified that he had been a concrete worker for 18 years, that he wore protective boots to keep dry and to prevent wet concrete from burning his skin and that he had previously witnessed an accident in which a concrete worker was burned by liquid concrete. At the close of the plaintiff's case the trial court granted the defendant's motion for a directed verdict. On appeal, plaintiff contended the defendant had failed to warn him of the caustic property of wet concrete. Affirming the trial court's decision, the appellate court concluded that the danger of skin burns from wet concrete was known and appreciated by the plaintiff

concrete worker. The court stated:

> "It is ineluctable from the foregoing evidence that plaintiff had actual knowledge of the risk of burning by wet concrete on the date of the accident. The cases have uniformly held that the purpose of a warning is to apprise a party of danger of which he has no knowledge and thereby enable him to take measures which will protect him against those dangers; however, *when a danger is obvious and generally appreciated, nothing of value is had by a warning and none is required under those circumstances.* [Citations.] The trial court correctly ruled under the circumstances of this case that the existence of *a duty to warn, which is normally a question of law in the first instance* [citation], did not arise because of general knowledge in the industry concerning the causticity of wet concrete, of which *this plaintiff had actual knowledge,* and because plaintiff had suffered an injury as a result of a common propensity of the product with which he was familiar." (Emphasis added.) 94 Ill. App. 3d 1091, 1099.

In *Curry, Huff* and the case at bar, the plaintiffs alleged they were not warned of the dangerous propensities of a manufacturer's product. The dangers complained of by the plaintiffs were well known to the plaintiffs, and, although aware of the dangers of the products, the plaintiffs continued to use them. In *Curry* and *Huff,* the court ruled there was no duty by the defendants to warn plaintiffs of that which the plaintiffs already knew, *i.e.,* the products' dangerous propensities. This rationale applies to the case before us as well.

█ The record clearly establishes, without contradiction, that Reliable was fully aware of the dangerous propensities of methanol. Technical and Ashland owed no duty to further warn Reliable of that which Reliable already knew. In addition to the extensive knowledge of Oscar Stirn, Reliable's president, of the explosive and flammable propensities of methanol, the record further reveals, again without contradiction, that Stirn had an even greater knowledge of methanol's highly combustible characteristics.

Stirn designed the warning labels on Reliable's shellac solvent containers. The precautionary wording and design on the labels were based on Stirn's knowledge of the standards of the Paint, Varnish and Lacquer Association and the Hazardous Products Labeling Act. Both required the word "danger" to appear on the label when the packaged substance had a flash point between 20 and 100 degrees. These precautions were also in material safety data sheets which described the various characteristics of methanol and were supplied to Reliable

by Ashland. Stirn was also aware that the methanol used in the Reliable shellac solvent was 99% industrially pure and that it had a flash point of 58° fahrenheit. Based on Stirn's knowledge of the proper precautions to place on the warning labels of Reliable's shellac solvent cans, he designed the warning labels to display the words "Danger, Flammable," "Precautions," "Keep away from heat, sparks or open flame," and "Use only with adequate ventilation."

There was additional evidence of Reliable's knowledge of methanol's flammable characteristics. Reliable was aware that Technical and Ashland delivered the methanol to Reliable in gasoline tanker trucks and that the methanol was siphoned from the tanker trucks to Reliable's underground storage tanks through grounding lines to eliminate static electricity and static sparks. Reliable pumped the methanol from its underground tanks through pipelines into a fill tank and then dispersed it into containers by a siphon filler. This operation was conducted in Reliable's building, which was specially constructed according to "Class 1, Group D, Fire Code" specifications to reduce fire hazards. We thus conclude that Reliable had equal knowledge and was well aware of methanol's flammable and explosive qualities and that Technical and Ashland were therefore under no duty to warn Reliable of these methanol characteristics. See *Peterson v. B/W Controls, Inc.* (1977), 50 Ill. App. 3d 1026, 1029, 366 N.E.2d 144; *Robinson v. Deck* (1975), 33 Ill. App. 3d 71, 78-79, 337 N.E.2d 316.

Reliable's reliance on *Shell Oil Co. v. Gutierrez* (1978), 119 Ariz. App. 426, 581 P.2d 271, is misplaced. In *Shell*, the Westinghouse Electric Corporation used xylene as a thinner to remove varnish from electric motors which Westinghouse would rewind. The xylene was purchased in drums which, when empty, were stored for return. Shell manufactured and distributed the xylene. The Christie Oil Company purchased the xylene from Shell and packaged it in drums. The Flint Oil Company purchased the drums of xylene from Christie and retailed them to Westinghouse.

Gutierrez, a Westinghouse employee, was given a bracket to weld by another Westinghouse employee, Miriam Starr. As Gutierrez began to weld the bracket, a nearby drum which had contained xylene exploded and injured Gutierrez and Starr, who subsequently brought an action against Shell, Christie and Flint. The following language in *Shell* clearly distinguishes that case from the case before us:

> "A hotly debated issue at trial and on appeal was the extent of the parties' knowledge of the dangerous propensities of xylene. *** Shell supplied multitudinous written information to them about the chemical properties of its products, including

xylene, but xylene was not singled out or distinguished from other solvents. Christie and Flint were not advised on procedures for safe handling. They knew xylene was flammable and that an empty drum could explode. Yet, they did not know that drums should be returned immediately and Christie stored hundreds of them. Nor were they told to flush out the 'empties'. Consequently, no such warnings were passed on to Westinghouse. ***.

*Gutierrez had not heard of xylene before the accident and had received no special instruction or warning from Stewart [the plant manager at Westinghouse] concerning xylene drums.* Starr's contact with xylene had been limited to dispensing it from a 5-gallon drum for washing his hands. He knew it was flammable and volatile. [Gutierrez and Starr] neither saw nor looked for labels on the drums by the dip tank. They both testified at trial that if they had seen the 'FLAMMABLE LIQUID' label on the drum they would not have welded in that area." (Emphasis added.) 119 Ariz. App. 426, 431-32, 581 P.2d 271, 276-77.

Neither *Shell, Bryant v. Technical Research Co.* (9th Cir. 1981), 654 F.2d 1337, nor *Pepper v. Selig Chemical Industries* (1982), 161 Ga. App. 548, 288 S.E.2d 693, upon which Reliable relies, is persuasive.

■ Reliable finally contends the trial court improperly entered summary judgment because "additional questions of fact" were unresolved between plaintiffs Jackson and Zamost and Reliable, but Reliable fails to point out any factual controversy between Reliable, Technical and Ashland. A factual controversy between Jackson, Zamost and Reliable will not suffice to preclude summary judgment on the uncontroverted facts between Reliable, Technical and Ashland.

For the reasons stated, the summary judgment entered by the trial court in favor of Technical and Ashland is affirmed.

Affirmed.

MEJDA, P.J., and LORENZ, J., concur.