WILMA MASON, Adm'r of the Estate of Robert L. Mason, Deceased, Plaintiff-Appellant, v. CATERPILLAR TRACTOR COMPANY *et al.*, Defendants-Appellees.

First District (1st Division)   No. 84—2924

Opinion filed December 23, 1985.

512

Gary B. Friedman, Ltd., of Chicago (Jay R. Giusti, of counsel), for appellant.

Mayer, Brown & Platt, of Chicago (Thomas B. McNeill, Stanley J. Parzen, and Lillian Miller, of counsel), for appellee Caterpillar Tractor Company.

Garretson & Santora, of Chicago (David W. Rosemeyer and Ronald T. Bishop, of counsel), for appellee Patten Tractor and Equipment.

PRESIDING JUSTICE BUCKLEY delivered the opinion of the court:

Plaintiff, Wilma Mason, administrator of the estate of decedent, Robert L. Mason, brought an action against defendants Caterpillar Tractor Company (Caterpillar) and Patten Industries, Inc. (Patten), seeking to recover damages for fatal injuries decedent sustained while making repairs on a track shoe from a Caterpillar tractor. Plaintiff's complaint was predicated on theories of strict products liability and negligence. The trial court granted summary judgment for defendants on both theories. Plaintiff's motion for reconsideration was denied, and this appeal followed. For the reasons set forth below, we affirm.

On August 25, 1975, plaintiff's decedent was employed at Wilkinson Welding Company, where his duties included performing repairs on component parts of tractors. On the above date, in furtherance of his duties, decedent was using a metal sledgehammer to perform repairs on a heavy steel track shoe from a Caterpillar tractor. A small bullet-like piece of metal from the track shoe came loose and struck decedent in the chest, fatally injuring him. In August 1977, plaintiff filed a complaint based on negligence and strict products liability the-

ories against Caterpillar, the alleged manufacturer of the track shoe; Patten, the alleged distributor of the track shoe; and Gust Newberg, the owner of the Caterpillar tractor. Newberg was later dismissed pursuant to settlement and is not a party to this appeal.

Plaintiff's complaint alleged that Caterpillar and Patten sold a Caterpillar tractor, including the steel tracks, to Gust Newberg. The complaint alleged in part that the tractor track was defective as a result of various negligent acts and/or omissions by defendants, and that the defective condition proximately resulted in the fatal injuries sustained by decedent. Only the following three allegations of misconduct are relevant to this appeal: (1) that defendants failed to use reasonable methods of heat treatment on the track shoe; (2) that defendants failed to use a sufficient amount of carbon in the steel used to make the track shoe; and (3) that defendants failed to warn decedent of the "impending danger."

Caterpillar and Patten denied the above allegations and other material allegations of the complaint. In April 1982, Caterpillar filed a motion for summary judgment, arguing that there was no evidence that it had manufactured the track shoe in question, there was no evidence of any defect in the product or its design, and that it had no duty to warn.

The evidence produced during the summary judgment proceedings established that the track shoe was part of a "track assembly," a term used to describe the portions of the tractor's undercarriage. In addition to the track shoes, the track assembly includes pins and bushings which drive the shoes, and the rails upon which the tractor rollers travel. A portion of the track shoe is raised and is known as a "grouser" or "grouser bar." It is this portion of the tractor which cuts into the ground to provide traction.

Although a track and its shoes are designed to withstand the severe wear of tractor use, the track and track shoes do eventually wear and require replacement or rebuilding. As a general rule, track links can usually be rebuilt at least once and connecting pins and bushings "turned," before the entire track and its track shoes need to be replaced. When a track has been taken off a tractor and stretched out, the links look like an enormous bicycle chain with track shoes bolted onto the outside surface of the chain of links. To disassemble the track for repairs, the track shoes first must be unbolted and removed, and then the links separated from each other by removing the round pins that hold them together. After the links are rebuilt and the pins and bushing turned, the track is reassembled.

The decedent had been employed at Wilkinson Welding for more

than 15 years prior to his death. William Wilkinson, Jr., president of the company, testified that decedent had repaired and rebuilt tractor track assemblies hundreds of times and was as knowledgeable as anyone in the plant about the method. At the time of the accident, decedent was rebuilding a track assembly using a pin and bushing press. The press was used to push the track portions back together, pushing the links back on pins and bushings, after which decedent would use a metal sledgehammer to straighten the shoe with a tap. Wilkinson testified that in tapping the track shoe, workers attempt to strike the flat portion of the shoe and avoid the raised grouser bar. It was not unusual, however, for workers to occasionally miss the flat portion and strike the grouser bar. In this case, decedent struck the grouser bar at a diagonal angle, causing a metal chip to leave the surface of the grouser and pierce his chest. At the time, decedent was wearing the safety glasses and shoes required by his employer.

Defendants presented expert testimony, uncontroverted by plaintiff, to the effect that decedent did not "tap" the shoe, but rather struck the track shoe with a full swing, exerting a great amount of force. An accident report by decedent's employer revealed that decedent was using a 20-pound sledgehammer at the time of his accident. Wilkinson testified that workers at his plant were supposed to use a 12- to 14-pound sledgehammer to tap the track shoe. Wilkinson additionally testified that slivers had come off of track shoes in the past when workers hammered on the shoes. However, he stated that this particular incident was a "freak accident, something that just never happened before" or "since." Wilkinson did nothing different after the accident to change his repair procedure.

It was undisputed that Caterpillar had no prior knowledge of any similar accidents or complaints regarding the metallurgical composition of its track shoes. There was no evidence that Patten had any knowledge of similar accidents or complaints concerning the metallurgical composition of Caterpillar track shoes.

Plaintiff, during the proceedings below, relied solely on Dr. Geoffrey Higgins, a professor of metallurgical engineering at the Illinois Institute of Technology. Higgins opined that the track shoe in question did not contain a sufficient depth of hardness and did not have enough carbon content. Higgins stated, however, that even if hardness and carbon content of the track shoe were increased, he could not say with certainty that the accident would not have occurred. He admitted that if sufficient force is applied, the ultimate strength of any metal can be exceeded. In his deposition, Higgins testified he had no opinion as to what effect his proposed design changes would have

on the desirability or usefulness of the track shoe.

Caterpillar presented the expert testimony of Professor Thomas Dolan, former head of the department of theoretical and applied mechanics at the University of Illinois-Urbana. Dolan testified as to conditions faced by track shoes in the field, stating that durability and ability to withstand loading forces and bending were important. For these reasons, hardness of the steel used in the shoes had to be limited. Increasing the depth of hardening and carbon content would lessen the shoe's toughness and resistance to wear in the field. Dolan further stated that Higgins' proposed design changes would not have prevented the decedent's accident.

Caterpillar additionally relied on the testimony of Gifford Rodine, a Caterpillar design engineer. Rodine testified that a higher level of carbon and greater depth of hardenability would decrease the chance of chipping, but increase the chance of brittle fracture and decrease durability.

On January 12, 1983, the trial court denied the motions of Caterpillar and Patten for summary judgment. Approximately one year later, defendants moved for reconsideration, asserting that the design of the track shoe was not unreasonably dangerous and that they had no duty to warn.[1] After hearing oral arguments, the court granted defendants' motion for reconsideration and ultimately entered summary judgment in defendants' favor as to the negligence and strict liability counts of plaintiff's complaint. Plaintiff's motion for reconsideration was denied.

On appeal, plaintiff argues that the granting of summary judgment as to the products liability and negligence counts was erroneous because questions of fact exist as to whether the track shoe was unreasonably dangerous in design and as to whether a warning was necessary in this case. In addressing plaintiff's argument, we initially recognize that summary judgment will only be entered in favor of the moving party where the pleadings, depositions, admissions and affidavits demonstrate that no genuine issue of fact exists which warrants trying the case. (Ill. Rev. Stat. 1983, ch. 110, par. 2—1005.) Although summary judgment is a drastic remedy to be used with caution, its use is to be encouraged in the proper case. *Continental Casualty Co. v. Polk Brothers* (1983), 120 Ill. App. 3d 395, 457 N.E.2d 1271.

■ In a cause of action premised on strict liability in tort, a

---

[1]As Caterpillar acknowledges in its appellate brief, reconsideration was not sought on the question of whether Caterpillar manufactured the track shoe in question.

plaintiff must plead and prove three elements: (1) the injury resulted from a condition of the product; (2) the condition was an unreasonably dangerous one; and (3) the condition existed when the product left the manufacturer's control. (*Woodill v. Parke Davis & Co.* (1980), 79 Ill. 2d 26, 402 N.E.2d 194.) An "unreasonably dangerous" product is one that fails "to perform in the manner reasonably to be expected in light of [its] nature and intended function." *Dunham v. Vaughan & Bushnell Manufacturing Co.* (1969), 42 Ill. 2d 339, 342, 247 N.E.2d 401.

It is further held that "a manufacturer is not an insurer of its product *** and it is under no duty to make products incapable of causing injury under any circumstance." (*Curry v. Louis Allis Co.* (1981), 100 Ill. App. 3d 910, 914, 427 N.E.2d 254.) A defect in the product must be the proximate cause of the plaintiff's injury (*Barr v. Rivinius, Inc.* (1978), 58 Ill. App. 3d 121, 373 N.E.2d 1063), and a legal inference of defectiveness may not be drawn merely from evidence that an injury occurred (*Artis v. Fibre Metal Products* (1983), 115 Ill. App. 3d 228, 232, 450 N.E.2d 756).

■ Applying these principles to the case before us, we first find that no material question exists as to whether the track shoe in question was unreasonably dangerous as designed. The record establishes that the track shoe was safe for its intended purpose--to be used on a tractor to move materials. It is undisputed that Caterpillar designed the track shoe to best withstand the wear, shocks and loads that such a product would experience in the field. It is further uncontroverted that other companies who manufacture track shoes do so with metallurgical specifications very similar to those of Caterpillar. Defendants' experts Dolan and Rodine agreed that making the design changes proposed by plaintiff's expert would severely affect the reliability, durability and utility of the product. Plaintiff's expert Higgins did not disagree with this testimony; at his deposition he was unable to express an opinion as to what effect his proposed changes would have on the track shoe's function. Furthermore, Higgins could not testify that his design changes could even be made.

Higgins also admitted that his proposed changes would actually increase the propensity for brittle fracture of the track shoe, thereby creating a new danger to workers. Although Higgins went on to state that he believed a metal's propensity for brittle fracture would decrease if the metal was heat treated and tempered correctly, his further testimony showed that this opinion lacked a proper foundation, *i.e.*:

"[Attorney for Caterpillar]: And do I correctly understand

that you have attempted to determine what tempering process would be necessary to minimize brittle fracture in the event that the hardenability in the metal in [the] track shoe was increased?

[Higgins]: I have not investigated brittle fracture."

Moreover, Higgins conceded that he could not say with any reasonable degree of scientific certainty whether decedent's accident would not have occurred even if his proposed changes were implemented. Defendants' expert Dolan unequivocally testified that the accident would not have been prevented even if plaintiff's proposed design changes had been made. Plaintiff has presented no evidence to rebut Dolan's testimony and thus has failed to set forth a triable issue as to causation.

It is apparent that plaintiff's expert testimony concerning changes in the design of the track shoe was based purely on speculation. This court has made it clear that expert testimony based on speculation, guess or conjecture is insufficient to avoid summary judgment. (*Vuletich v. Alivotvodic* (1979), 73 Ill. App. 3d 927, 392 N.E.2d 663.) Accordingly, we hold that the trial court properly determined that no issue of fact existed as to whether the design of the track shoe was unreasonably dangerous under a strict liability theory.

■■ We next turn to plaintiff's allegations concerning defendants' duty to warn. It is well settled that a failure to warn of a product's unreasonably dangerous propensities can make a product unreasonably dangerous and thus may serve as the basis for holding a manufacturer or seller strictly liable in tort. (*Woodill v. Parke Davis & Co.* (1980), 79 Ill. 2d 26, 402 N.E.2d 194.) However, for there to be a duty to warn, it must be "objectively reasonable" to expect the user of the manufacturer's product to be injured in the manner in which the plaintiff was injured. (*Genaust v. Illinois Power Co.* (1976), 62 Ill. 2d 456, 466, 343 N.E.2d 465.) It is further held that when the danger is obvious and generally appreciated, nothing is gained by a warning and none is required under those circumstances. (*Huff v. Elmhurst-Chicago Stone Co.* (1981), 94 Ill. App. 3d 1091, 1099, 419 N.E.2d 561.) "The determination of whether a duty to warn exists is a question of law and not of fact." *Genaust v. Illinois Power Co.* (1976), 62 Ill. 2d 456, 466, 343 N.E.2d 465.

■■ Here, we find as a matter of law that no duty to warn existed. First, the accident in this case was not objectively foreseeable. Decedent's employer labelled it as a "freak" accident that has never before happened. It occurred when decedent, instead of hitting the flat portion of the track shoe, hit the raised portion of the shoe.

Rather than using a 12-pound sledgehammer, he used a 20-pound sledgehammer. Instead of merely tapping the track shoe, he took a full swing and hit the grouser at just the right angle to eject a piece of metal from the surface of the grouser. There is no evidence that defendants were even aware that the track shoes were repaired or reassembled with sledgehammers.

The evidence further shows that decedent appreciated the danger in hammering on the track shoes. In the past, slivers had come off of track shoes at Wilkinson when they were hammered on by workers. Decedent wore safety glasses when hammering on the track shoes, thereby indicating he was aware of the risk of injury. The testimony of decedent's employer showed that this was a matter of common sense. When asked if he discussed with workers the danger of hitting track shoes with sledgehammers, decedent's employer testified that his employees talked about the danger and said, "Naturally, if you hit something wrong, you know that there is always a chance of something flying." Just as exerting five tons of pull on a linkage that is rated for only one ton is a known danger (*Harms v. Bell Helicopter Textron* (N.D. Ill. 1982), 567 F. Supp. 28, *aff'd* (7th Cir. 1983), 714 F.2d 149), hitting with a full swing on the edge of a grouser of a track shoe with a heavy sledgehammer is an obvious danger. Simple common sense, particularly when combined with decedent's extensive experience performing this type of work, was enough to alert him of the danger.

Moreover, the undisputed facts show that the alleged lack of warning had no causal connection to the injury. First, there was nothing further that decedent could have done to avoid injury in response to a warning; the evidence shows that Wilkinson's practice was to attempt to avoid hitting the grouser. As such, any warning to avoid hitting the grouser would have been superfluous. Furthermore, plaintiff's surmise that decedent "perhaps" could have done something else to avoid injury is precisely the type of surmise or conjecture that is impermissible to avoid summary judgment. (*Kimbrough v. Jewel Companies, Inc.* (1981), 92 Ill. App. 3d 813, 817, 416 N.E.2d 328.) If there was something else that could have been done, it was plaintiff's burden to establish that fact in the record.

Given our reasoning above, we find that no triable issue exists as to whether the product in question was unreasonably dangerous under a strict liability theory due to defendants' failure to warn. Accordingly, we conclude that the trial court correctly granted summary judgment for defendants as to those counts of plaintiff's complaint seeking recovery on the basis of strict products liability.

■■ ■ We next consider those counts of plaintiff's complaint based on ordinary negligence. Plaintiff alleges that defendants were negligent in failing to use reasonable methods of heat treatment on the track shoe, thereby causing insufficient hardenability; failing to place a sufficient amount of carbon in the track shoe; and failing to warn decedent of the danger. We believe that the same lack of evidence which caused plaintiff's strict liability counts to fail also causes plaintiff's negligence counts to fail. Essential elements of an action sounding in negligence are existence of a duty of reasonable care owed plaintiff by defendant, breach of that duty and an injury proximately caused by that breach. (*McColgan v. United Mine Workers of America* (1984), 124 Ill. App. 3d 825, 464 N.E.2d 1166.) Existence of a legal duty depends not only upon the reasonable foreseeability of injury from the existence of the particular conditions, but also upon the magnitude of the burden of guarding against the injury, consequences of placing the burden upon defendant, public policy and social requirements. (*McGinty v. Nissen* (1984), 127 Ill. App. 3d 618, 469 N.E.2d 445.) In light of the evidence discussed above, we conclude as a matter of law that plaintiff has failed to present a triable issue as to whether defendants breached any duty, much less as to whether the breach proximately caused the injuries in question. Accordingly, the trial court properly granted defendants' motion for summary judgment on the negligence counts of plaintiff's complaint.

■ Finally, plaintiff argues that the trial court abused its discretion when it refused to terminate the hearing on defendants' motion for reconsideration and permit her leave to file an affidavit of her expert. We disagree. The hearing on defendants' motion for reconsideration had originally been scheduled for March 26, 1984, but plaintiff requested the hearing be postponed so that additional affidavits could be filed. Plaintiff, however, failed to file any affidavits in the 30 days between March 26 and April 26, 1984. Instead, plaintiff requested a further delay when the court was prepared to rule adversely to plaintiff. Under the circumstances, the court acted well within its discretion in denying plaintiff leave to file the affidavit. See *Wooding v. L & J Press Corp.* (1981), 99 Ill. App. 3d 382, 425 N.E.2d 1055.

Even assuming that the affidavit should have been considered, our disposition of this case is unchanged. The additional Higgins affidavit purported to show only that his proposed design changes would not render the product "unusable." The affidavit stated nothing about what effect the design changes would have on the primary field uses of the track. Hence, Higgins did not dispute that the shoe would experience severe adverse field use consequences and that there would be

inadequate field performance if his design changes were made.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

CAMPBELL and O'CONNOR, JJ., concur.