DONNA RENFRO, Plaintiff-Appellee, v. ALLIED INDUSTRIAL EQUIP-
MENT CORPORATION, Defendant-Appellee (Crown Controls Corporation
*et al.*, Defendants-Appellants; Logisticon Incorporated *et al.*, Third-Party
Plaintiffs and Separate Appellees; Monsanto Company, Third–Party Defend-
ant-Appellee and Separate Appellant).

Fifth District   No. 5—85—0612

Opinion filed April 14, 1987.—Rehearing denied May 19, 1987.

Churchill & McDonnell, of Belleville (Joseph B. McDonnell, of counsel), for appellant Crown Controls Corporation.

Wildman, Harrold, Allen & Dixon, of Chicago, and Brown, James & Rabbitt, of Belleville (Ruth E. VanDemark and Michael J. Pitzer, of counsel), for appellant Logisticon Incorporated.

Coburn, Croft & Putzell, of Belleville (Richard A. Mueller & Peter M. Hamilton, of counsel), for Monsanto Company.

Ducey, Feder & Ducey, Ltd., of Belleville (C. Patout Ducey, of counsel), for appellee Allied Industrial Equipment Corporation.

Cook, Shevlin, Keefe & Chatham, of Belleville (Bruce N. Cook, of counsel), for appellee Donna Renfro.

JUSTICE HARRISON delivered the opinion of the court:

Plaintiff, Donna Renfro, brought an action in the circuit court of St. Clair County to recover damages for personal injuries she sustained in accidents which occurred while she was operating an orderpicker during the course of her employment. Named as defendants were Crown Controls Corporation (Crown), the manufacturer of the orderpicker; Logisticon, Incorporated (Logisticon), the manufacturer of the orderpicker's electronic guidance system; and Allied Industrial Equipment Company (Allied), the orderpicker's dealer. Plaintiff's claims against Crown and Logisticon were based on strict liability. Her cause of action against Allied sounded in negligence. Crown and Logisticon each filed a third-party action for contribution against Monsanto, plaintiff's employer, alleging assumption of risk. In addition, Crown filed a counterclaim against Logisticon for contribution, and Logisticon filed a counterclaim for contribution against Allied.

Following a lengthy trial, the jury returned a verdict in favor of plaintiff, assessing her damages at $1,250,000. The jury apportioned liability for these damages at 0% for Allied, 90% for Logisticon, and 10% for Crown. It further found that Monsanto was liable for 15% of the damages assessed against Logisticon and for 10% of the damages assessed against Crown. Post-trial motions filed by Logisticon, Crown, and Monsanto were denied, and each of these parties now appeals.

Numerous issues have been presented for our review. Crown and Monsanto each contend that it is not liable as a matter of law and that the trial court therefore erred in denying its motions for a directed verdict and for judgment notwithstanding the verdict. Logisticon makes the same argument with respect to the claims against it. Logisticon further asserts, in the alternative, that it should be granted a new trial because: (1) the jury's verdict, including its apportionment of damages, is contrary to the manifest weight of the evidence; (2) the trial court erred in ruling on the admission and exclusion of certain evidence; (3) improper remarks were made by plaintiff's attorney; (4) the jury was not correctly instructed; and (5) the amount of damages awarded by the jury was "beyond the flexible means of what is reasonably supported by the evidence." For the rea-

sons which follow, we affirm.

In undertaking our review of this case, we must consider the evidence in the light most favorable to the plaintiff, the prevailing party. (See *Holmes v. Sahara Coal Co.* (1985), 131 Ill. App. 3d 666, 674, 475 N.E.2d 1383, 1389.) That evidence established that in 1980, Monsanto renovated one of its storerooms at its manufacturing facility in Sauget, Illinois. To increase the storage capacity of the storeroom, known as the BBZ warehouse, Monsanto converted it from what had been a ground-level operation to one utilizing high-rise shelving. The shelving reached a height of 21 feet and was arranged in two long (160-foot) rows separated by narrow (55-inch) aisles, designated as aisle A and aisle B.

Stored on the shelving were industrial parts, lubricants, and other items used by Monsanto's manufacturing facility. To deposit and retrieve those items, Monsanto decided to utilize "man on board order picking vehicles." With respect to the method for guiding the vehicles down the narrow aisles, research done by Monsanto disclosed the availability of two alternatives: a mechanical system and an electronic one. The mechanical, or guided rail, system consisted of steel rails mounted on the base of the shelves along with guidewheels mounted on outriggers on the orderpicker vehicles. The guidewheels would follow the steel rails, physically preventing the vehicles from striking the shelving and keeping them within the aisles. The electronic, or automatic, guidance system entailed burying a wire in the warehouse floor which would transmit signals to sensors mounted on the vehicles, permitting the vehicles to be guided automatically without the need for manual steering by the operator.

Apparently the only two electronic guidance systems available on the market at this time were the "Pathfinder," manufactured by Logisticon, and the "Ray-Guide," manufactured by Raymond Corporation. The "Ray-Guide" could be used only on the orderpicker manufactured by Raymond Corporation, while the "Pathfinder" was designed to be installed on vehicles manufactured by a variety of companies, including Crown. Monsanto ultimately selected the Pathfinder system and decided to have it installed on Crown's model 30SP42TT orderpicker.

The Crown 30SP42TT orderpicker chosen by Monsanto was an electrically powered, forklift-type vehicle. It weighed several tons and could travel at speeds of up to five or six miles per hour. The operator's compartment consisted of a rectangular platform, behind which were situated two forks for lifting. Installed on the forks was a steel cage for carrying items which were to be deposited or retrieved from

the shelving in the warehouse. The sides of the operator's compartment were open. In front, above the steering controls, was a plexiglass shield to protect the operator from moving parts in the lifting mechanism. Above was a panel of four parallel steel bars intended to serve as an overhead guard.

The orderpicker was designed so that the operator's compartment would be lifted and lowered along with the carrying cage behind it. This was done in order to permit items to be deposited or retrieved manually by the operator. The orderpicker could be driven forward or backward while the operator's compartment and carrying cage were elevated. However, the maximum speed of the vehicle was automatically reduced when the elevation exceeded 24 inches, and travel was cut off entirely when the elevation reached 180 inches.

The orderpicker was equipped with a "deadman" brake. In order to drive the vehicle, the operator had to depress the brake pedal with his foot and keep it depressed. If the operator released the pedal, an hydraulic cylinder would activate the brakes, bringing the vehicle to a stop. In addition, release of the pedal would activate a time delay relay (TDR), which was supposed to shut off the vehicle's power steering after 20 seconds in order to conserve power while the operator was placing items on or retrieving them from the warehouse shelving.

Guidewheels, for use with a guided rail steering system, were available as an option on the Crown orderpicker, but were not purchased by Monsanto because of its decision to use Logisticon's Pathfinder electronic guidance system. Logisticon advertised that the Pathfinder system would be suitable for the type of warehouse configuration that existed at Monsanto's renovated BBZ warehouse, *i.e.,* one with high storage shelving and narrow aisles, because it required only 4 inches of clearance on each side of the orderpicker and eliminated the need for steel guiderails. The Logisticon salesman who sold the Pathfinder system to Monsanto testified that when making his presentations to the company he emphasized the system's high degree of reliability. The salesman further indicated that he told Monsanto that guidewheels and rails would not be necessary if they bought the Pathfinder system.

Installation of the Pathfinder system required no factory modifications to Crown's orderpicker and could be accomplished at the purchaser's place of business by Logisticon personnel. The principal components of the system included: (1) a wire guidepath imbedded in the warehouse floor, energized by a "line driver" mounted on the warehouse wall; (2) a steering wheel assembly, which replaced the orderpicker's standard steering wheel; (3) an electronic power steering sub-

system, comprised of tachometer, gear box, servo board, heat sink, and various other assemblies; and (4) a guidance subsystem, comprised of front and rear sensors mounted under the orderpicker, a "position potentiometer" connected mechanically to the orderpicker's steering mechanism, and a sensor amplifier, which processed and transmitted signals from the sensors and position potentiometer to the power steering subsystem.

The Pathfinder system permitted operation of the orderpicker in three alternative modes: manual, automatic, and override. Manual allowed steering to be controlled by the operator. It was to be used when the orderpicker was not in the narrow aisles or was exiting from the aisles. Although the operator himself had to steer in this mode, steering was power-assisted. When the automatic mode was chosen, the orderpicker would "seek" the energized wire. The vehicle would remain in manual until it was near the wire, where the sensors would "acquire" the signal and the vehicle would be automatically aligned over the wire and steered into the aisle. If the sensors lost the signal and the orderpicker left the wire guidepath, steering control would be returned to the operator. Override was simply a backup mode which bypassed the Pathfinder electronics entirely and permitted the orderpicker to be operated as originally equipped without the Pathfinder system.

Monsanto purchased two Crown orderpickers and two Pathfinder systems from Allied, which was a dealer of these products and others. As part of the purchase agreement, Allied was to provide one year's free service and preventative maintenance on the orderpickers, and Crown was to assist Monsanto in training its operators. The orderpickers were delivered, the Pathfinder systems were installed, and the vehicles were placed into service at the BBZ warehouse by Monsanto in December of 1980 or early January 1981. For purposes of this discussion, these orderpickers shall be referred to as unit 1 and unit 2. Generally, unit 1 was assigned to operate in aisle A of the warehouse, and unit 2 was assigned to aisle B.

Problems with the equipment appeared almost immediately. Logisticon field service reports disclosed that on January 5, 1981, Logisticon was notified of difficulties with both units. Unit 1 was reported to have "no automatic guidance," while unit 2 had no "steering." John Mills, a Logisticon field service representative, went to the warehouse two days later. He repaired a crushed position potentiometer cable on unit 1 and replaced the heat sink assembly and servo board on unit 2.

The day after these repairs, Logisticon was notified that unit 2 again had "no power steering." The field service report noted that

this was the "2nd failure." John Mills returned to the warehouse four days later, on January 12, 1981, and "checked all wiring—replaced heat sink & servo [board], rechecked all servo adjustment[s]." Other evidence showed that the deadman switch may also have been replaced during this period.

Tom Vartanian, an employee of Monsanto assigned to the BBZ warehouse, testified that he subsequently had an accident while operating one of the orderpickers in aisle B. At the time of the accident, which took place in late February or early March of 1981, Vartanian had been operating the orderpickers for about two months. According to Vartanian, the orderpicker was in its automatic mode and the operator's compartment was elevated approximately 10 feet. He had made several stops along the aisle to deposit items on the shelving and was about to stop again when "the thing jumped off [the wire]." As it did so, the storage cage behind the operator's compartment apparently hit the shelving and was pulled off, striking the floor.

After the accident, Vartanian and his foreman tested the equipment in an attempt to duplicate what had happened. When they could not, the foreman placed a disciplinary letter in Vartanian's personnel file based on his belief that operator error was to blame. Although Vartanian admitted on cross-examination that he could not say for sure that the orderpicker really went off the wire, the evidence showed that after plaintiff's accident a few months later, Vartanian's foreman removed the disciplinary letter from his file, apparently because the foreman then realized that equipment failure and not operator error was the cause for Vartanian's accident.

Another Monsanto employee assigned to the BBZ warehouse, Cecilia Larson, testified that she too had experiences in which the orderpicker she was operating went off the wire. Larson stated that she started operating the orderpicker in aisle A in April of 1981. According to her:

> "[T]here was a couple of incidents. It [the orderpicker] went off the track, it hit the bins, but there was no major damage. In the last one I was backing out, it [the orderpicker] went off the track and it took off a couple of shelves of steel phlanges. [*sic*]"

A Logisticon field service report showed that on April 15, 1981, the company was notified that unit 1, the orderpicker used by Larson, had "poor reverse guidance." This call was serviced by a Logisticon representative named Merrill Lewis on April 17, 1981. The report shows that Lewis checked the position potentiometer and cabling and made certain adjustments. The previous week, on April 9, 1981, Logisticon had also been notified that unit 2 "jumps rear guidance at

times." The vehicle was checked on April 10, 1981, and a different Logisticon field representative, Fred Wojciuch, reported that he found and repaired a bad connector on the front sensor.

Throughout this period Allied performed the routine preventative maintenance and did some service work on units 1 and 2. According to the maintenance schedule, Allied was due to provide its next service call on May 4, 1981. On that date, Logisticon's central response center in California received a call from Monsanto that unit 2 was "going off track." This was the type of problem which Logisticon, and not Allied, was normally requested by Monsanto to correct. Logisticon assigned Merrill Lewis to respond to the call. Lewis testified that he received his assignment from Logisticon on May 5, 1981, at 8 a.m. Sauget time.

Plaintiff testified that on May 5, 1981, she was employed by Monsanto in the BBZ warehouse. She had worked for Monsanto since 1975 and had operated orderpicker unit 2 on a daily basis since April 28, 1981. According to plaintiff, she had experienced trouble with the deadman brake on unit 2 during the two- or three-day period prior to May 5. Specifically, she said that she had to "stomp on [the deadman] real hard a couple times" on several occasions in order to make the orderpicker go forward or backward. Plaintiff stated that she advised her foreman of this problem and was told by him that someone would work on it.

Plaintiff reported for work on May 5, 1981, at 8 a.m. and found that unit 2 was already in service. When the previous operator finished with the unit, he left it in aisle B fully energized. Plaintiff mounted the unit, checked to see that it was in the automatic mode, then drove it backward and forward for a few feet to make sure that the guidance system had "acquired" the wire and that the unit could be steered automatically. After completing this procedure, plaintiff drove the unit to the end of the aisle, then put it in reverse to return, still using automatic guidance. As the unit was proceeding in reverse, it "slammed into the shelves" without warning. The force of the impact caused plaintiff to fall backwards. At the same time, materials from the shelving, including sheets of Teflon, flanges, and lubricants, cascaded into the operator's compartment, pinning the plaintiff there. She could not move. Her foreman came to her aid and drove the orderpicker out the aisle. When plaintiff was extricated from the operator's compartment, she reported to Monsanto's dispensary complaining of neck pain and a headache.

Merrill Lewis, Logisticon's field service representative, arrived at the BBZ warehouse sometime after plaintiff's accident. He noted on

his report that unit 2 was intermittently losing rear guidance, and he made certain adjustments to the automatic guidance system. Lewis tested the unit to see if he, himself, could make it malfunction. He could find nothing wrong and left the warehouse. Thereafter, Monsanto placed unit 2 back in service.

Lewis returned to the warehouse the following morning. At that time he discovered that unit 2 would drop out of the automatic mode periodically. He replaced certain electronic components, tested the unit, and, once again, left. Sometime later in the day, however, plaintiff had a second accident while operating unit 2. The unit was again moving backward down aisle B in the automatic mode, and again without warning it hit the shelving. Plaintiff's back struck the steering wheel, and she snapped her neck, but nothing fell on her. After this accident, plaintiff was able to maneuver the unit out of the aisle without help and once more reported to Monsanto's dispensary.

On May 7, 1981, the day after plaintiff's second accident, yet another Logisticon field service representative arrived on the scene. The representative, named John Mills, questioned plaintiff about the accident and performed extensive tests on unit 2. Mills testified that he found the deadman brake to be poorly adjusted and the time delay relay (TDR) to be defective. According to Mills, the deadman brake would activate when it was not supposed to, and because the TDR did not work, the unit's power steering hydraulics would shut off immediately instead of remaining operable for the full 20-second period. When this occurred, the Logisticon system, which depended upon the unit's hydraulics for power, could not provide guidance and steering would fail instantaneously. Because Mills believed that the accidents were caused by the deadman brake and TDR, and not by a failure of the Logisticon system, an Allied repairman was summoned to perform repairs. Ken Berry, the Allied repairman, testified that he went to the BBZ warehouse on May 7, 1981, and adjusted and bled unit 2's brakes; adjusted the unit's actuator arm, a component related to activation of the deadman switch; checked all wiring connections; and wired around the TDR until a replacement for it could be installed. Although Berry stated that he operated the unit and could find no problem with the equipment, and although he could not recall at the time of trial why he had wired around the TDR, he did say that the only reason he would have done so was if he thought that there might have been a malfunction which prevented the TDR from keeping the unit's hydraulics activated for the full 20-second period.

While Mills attributed plaintiff's accidents to the deadman brake and the TDR at trial, a committee formed by Monsanto to investigate

what had happened characterized the accidents as "Electrical failure[.] High-rise orderpicker wire guidance." During the course of its investigation, the committee apparently received no complaints regarding possible defects with the mechanical components of the orderpicker, as opposed to the guidance system. This was so even though Logisticon representatives were questioned extensively on the matter. Barney Donohue, a member of the committee, recalled that "[c]lear up until [plaintiff's] injury [Logisticon] had still not satisfied the problem of intermittently running off the wire guidance system," and that "they didn't really know what the heck was wrong." Moreover, even after the deadman brake and TDR were serviced by Allied, problems with the guidance system persisted. Logisticon field service reports admitted into evidence indicated that on July 17, 1981, six weeks after plaintiff's accidents, Logisticon once again made adjustments to the guidance system of unit 2, including replacement of the servo board, and replaced the servo board and heat sink assembly and reconnected the position potentiometer cable of unit 1 because that unit had "no manual steering; no acquisition of wire in auto."

By the time of plaintiff's second accident, unit 2 had been operated at the BBZ warehouse for a total of only 286 hours. All repairs and maintenance had been done by trained, authorized personnel. There is no dispute that Allied had performed all of the required preventative maintenance, and there was nothing to suggest that it did anything which would have affected guidance of the unit.

Following plaintiff's accidents, and a result of its investigation, Monsanto decided to install a mechanical, or guided rail, system in the BBZ warehouse. Guidewheels were attached to the orderpickers, and steel guiderails were placed at the base of the shelving. No further incidents of orderpickers colliding with the shelves occurred thereafter.

Although plaintiff returned to work after her accidents, she suffered serious and chronic pain. An orthopedic specialist, to whom she had been sent by Monsanto, placed her on light duty, gave her a cervical collar to wear, prescribed traction twice a day, and had her undergo heat and ultrasound therapy at Monsanto's dispensary. When her condition continued to deteriorate, plaintiff was sent to a neurosurgeon named Dr. Walker. In describing her symptoms at that time, plaintiff stated: "My neck was hurting real bad. My arms and hands would go numb. I was limping. My hip hurt real bad. My lower back."

Dr. Walker testified by deposition that when he first examined plaintiff in September of 1981, he found no objective signs of neurological injury. Approximately six weeks later, he admitted plaintiff to the hospital for physical therapy and diagnostic tests. Among the

tests performed was a myelogram, which consisted of injecting dye into plaintiff's lower back using a 3½-inch needle. Plaintiff had an allergic reaction to the dye used in this test and was confined to the hospital for 10 or 11 days. Dr. Walker stated that he found no ruptured disc, no pressure on her spinal cord, no symptoms of thoracic outlet syndrome. According to Walker, she was not a candidate for surgery. In his opinion, the results of his tests were consistent with the finding of degenerative arthritis. He did not believe this to have been caused by the accidents. Plaintiff continued to see Dr. Walker, who prescribed use of a transcutaneous nerve stimulator (TENS) unit for her back pain.

Although Walker felt that plaintiff's condition had improved and that she could recover with conservative treatment, Monsanto sent her to another neurosurgeon, Dr. Geise. Contrary to Dr. Walker, Dr. Geise apparently believed that plaintiff did have a ruptured disc. Geise admitted plaintiff to the hospital again, where she underwent a second myelogram. Again plaintiff suffered an allergic reaction to the dye, although not as severe. Following the myelogram, Geise performed surgery on plaintiff to remove the ruptured disc from her neck. The surgery failed to relieve plaintiff's pain. To the contrary, plaintiff testified that her neck "got a lot worse." In her words, "[I]t just hurt so bad I could hardly stand it."

Plaintiff subsequently sought treatment from Dr. Joseph Hanaway, a board-certified neurologist. Hanaway first saw plaintiff at his office in November of 1982. Although his initial examination disclosed few objective findings, he ordered plaintiff to stop work and arranged for her to begin three weeks of therapy. He also prescribed Percodan, "a medium range narcotic painkiller," instead of the aspirin which she had been taking.

Following plaintiff's initial course of physical therapy, Hanaway saw plaintiff again on several occasions over the next two months. He administered anti-arthritic compounds; continued, then stopped, physical therapy; and had plaintiff undergo a CT scan, which proved negative. Hanaway next saw plaintiff in February 1983. His report on that visit indicated that plaintiff had returned to work on the first of the month with a 35-pound weight limit and was experiencing increased pain and "trouble straightening up a number of times at work." At this point, Hanaway performed an examination for a neurological disorder known as thoracic outlet syndrome. That examination disclosed that plaintiff had "a clear right thoracic manifestation." He gave her exercises to do and advised her to be cautious in using her right arm so as not to aggravate the problem.

Plaintiff continued to see Dr. Hanaway throughout the spring and summer of 1983. During this period, plaintiff was advised by Dr. Hanaway to stop work for various periods of time. She received facet joint injections in her lower back, continued her thoracic outlet exercises, and was given more Percodan. Thereafter, on August 30, 1983, plaintiff was once more admitted to the hospital for therapy. At the hospital, plaintiff was seen by Dr. Edward Ring, a thoracic surgeon, who diagnosed her condition as right thoracic syndrome. Dr. Ring performed surgery on plaintiff for this condition on October 5, 1983. That surgery entailed cutting incisions into plaintiff's throat and under her arm through which a rib and some muscles were removed. The incisions left plaintiff with permanent scars, although Dr. Ring stated that they would not ordinarily be visible.

Plaintiff testified that before the surgery, her right arm would go numb and stay cold all the time. In addition, her arm and neck always hurt. After the surgery her right side improved, but she developed thoracic outlet syndrome on her left side. She continued taking Percodan and was also given Tylenol #4 with codeine, another pain relief medication, which she alternated with the Percodan. When her left thoracic outlet problem became progressively worse, plaintiff was admitted to the hospital yet again. On this visit, plaintiff was to receive surgery on her left side, but the surgery was not performed. At the time of trial, plaintiff was still considering whether to go through with that surgery. In her words, she did not know if she wanted to have it done because "[I]t was so painful. It's just horrible."

According to Dr. Hanaway, plaintiff's ruptured disc and thoracic outlet syndrome were directly related to her accidents at the BBZ warehouse. James England, a vocational rehabilitation counselor called by Logisticon, testified that plaintiff was still capable of performing certain jobs at Monsanto's plant, most of which were clerical in nature. In Dr. Hanaway's opinion, however, plaintiff's injuries were permanent and had rendered her permanently disabled. Hanaway testified that plaintiff will ultimately have to have additional surgery and that if she does not recover from her thoracic outlet syndrome, she will be unable even to do housework.

Plaintiff stated that she was 37 years old. Her life expectancy was 42.7 years. She had been married just over three years and had a 14-year-old son by a prior marriage. In describing her condition, plaintiff stated that she no longer sleeps in bed with her husband, but instead uses the couch. She does so in part because it helps keep her from rolling over on her back. Plaintiff stated that if she were to roll over, she would have to crawl out of bed in the morning. Plaintiff testified

that she now rarely goes through a full day without experiencing pain in her arms. Her back hurts when she sits or stands too long, she must lay down for several hours on an average day, and she has gained 30 pounds since her accidents. Plaintiff already requires help in doing her household chores. She continues to take Percodan approximately four times per week.

Plaintiff's medical expenses attributable to the May 1981 accidents amounted to $29,326.82 at the time of trial. An economist called by plaintiff testified that the amount of money presently required to compensate plaintiff for future lost wages would range from $442,142 to $653,380, depending on how long plaintiff continued to work and the rate at which wages increased. With respect to the wages already lost by plaintiff because of her injuries, the evidence showed that plaintiff's earnings declined from $17,700 in 1981, to approximately $14,800 in 1982, and then to approximately $11,700 in 1983. Plaintiff was unable to work and earned no wages at all after July 13, 1983.

Based upon the foregoing evidence, the jury returned a verdict in favor of plaintiff, assessing her damages at $1,250,000. It apportioned liability for these damages at 0% for Allied, 90% for Logisticon and 10% for Crown. It further found Monsanto liable to Logisticon and Crown on their respective third-party claims for contribution. Logisticon, Crown, and Monsanto have all appealed, and we shall consider each of their arguments in turn.

■ As noted at the outset of this opinion, plaintiff's claims against Logisticon and Crown were based on strict liability in tort. To recover under this theory, plaintiff was required to prove as to each defendant: (1) that her injury resulted from a condition of the product manufactured by that defendant (the Pathfinder guidance system in the case of Logisticon, the orderpicker in the case of Crown), (2) that the condition of the product was an unreasonably dangerous one, and (3) that the condition existed at the time the product left its manufacturer's control. *Varady v. Guardian Co.* (1987), 153 Ill. App. 3d 1062, 1066; *Ralston v. Casanova* (1984), 129 Ill. App. 3d 1050, 1057, 473 N.E.2d 444, 449.

On this appeal, Logisticon and Crown each contend that plaintiff failed to prove that its particular product suffered from a defect which rendered the product unreasonably dangerous. Logisticon asserts that any defect lay with Crown's orderpicker, not the guidance system, and that responsibility for plaintiff's injuries rested entirely with Crown, Allied, and Monsanto. It therefore argues that it should have been granted a directed verdict, a judgment notwithstanding the

verdict, or a new trial. Crown, on the other hand, asserts that plaintiff's injuries were caused exclusively by a defect in Logisticon's guidance system and not by any unreasonably dangerous condition in the orderpicker. For this reason, Crown, too, believes that it should have been granted a directed verdict or a judgment notwithstanding the verdict. Unlike Logisticon, however, Crown does not seek a new trial.

■■ ■ In addressing these contentions, we must first consider the question of when a product may be found unreasonably dangerous. Under Illinois law, injuries are not compensable under strict liability if they are caused by those inherent properties of a product which are obvious to all who come into contact with them. (*Walker v. Maxwell City, Inc.* (1983), 117 Ill. App. 3d 571, 575, 453 N.E.2d 917, 921.) Strict liability applies only when the product is dangerous to an extent beyond that which would be contemplated by the ordinary person with the ordinary knowledge common to the community as to its characteristics. See *Palmer v. Avco Distributing Corp.* (1980), 82 Ill. 2d 211, 216, 412 N.E.2d 959, 962.

A product may be found unreasonably dangerous by virtue of a physical flaw or imperfection in the product, a design defect, or a failure by the manufacturer to warn of the danger or to instruct on the proper use of the product. (Illinois Pattern Jury Instructions, Civil, Strict Liability in Tort, at 400—8 (Supp. August 1986).) A legal inference of defectiveness may not be drawn merely from evidence that an injury occurred. (*Mason v. Caterpillar Tractor Co.* (1985), 139 Ill. App. 3d 511, 517, 487 N.E.2d 1043, 1047.) Nevertheless, a *prima facie* case that a product was defective and that the defect existed when it left the manufacturer's control is made by proof that in the absence of abnormal use or secondary causes, the product failed to perform in the manner reasonably to be expected in light of its nature and intended function. *Varady v. Guardian Co.* (1987), 153 Ill. App. 3d 1062, 1066; *Ralston v. Casanova* (1984), 129 Ill. App. 3d 1050, 1057, 473 N.E.2d 444, 449.

■ The issue of whether a product is defective under the foregoing standards is ordinarily a question of fact for the jury. (*Anderson v. Hyster Co.* (1977), 56 Ill. App. 3d 41, 48, 371 N.E.2d 279, 284, *aff'd.* (1974), 74 Ill. 2d 364, 385 N.E.2d 690.) In a strict liability case, a directed verdict or judgment notwithstanding the verdict should not be entered unless "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." (56 Ill. App. 3d 41, 48, 371 N.E.2d 279, 285, quoting *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513.)

Nor should a new trial be granted unless the jury's verdict is contrary to the manifest weight of the evidence. (See *Mizowek v. DeFranco* (1976), 64 Ill. 2d 303, 310, 356 N.E.2d 32, 36.) A verdict is contrary to the manifest weight of the evidence only where, upon review of all of the evidence in the light most favorable to the party who prevailed at trial, an opposite conclusion is clearly apparent or the jury's finding is palpably erroneous and wholly unwarranted, is clearly the result of passion or prejudice, or appears to be arbitrary and unsubstantiated by the evidence. *Ford v. City of Chicago* (1985), 132 Ill. App. 3d 408, 412, 476 N.E.2d 1232, 1236; see also *Holmes v. Sahara Coal Co.* (1985), 131 Ill. App. 3d 666, 674, 475 N.E.2d 1383, 1389.

■ In this case, the record was sufficient to establish the presence of a defect in the Pathfinder guidance system. Although the precise cause of the problem was apparently never isolated by Logisticon's field service representatives, the absence of such proof is not fatal to plaintiff's case. The existence of a defect may be proved inferentially by either direct or circumstantial evidence. (*Ralston v. Casanova* (1984), 129 Ill. App. 3d 1050, 1057, 473 N.E.2d 444, 449; see *Varady v. Guardian Co.* (1987), 153 Ill. App. 3d 1062, 1067; W. Prosser, Torts sec. 103, at 672-73 (4th ed.1971).) Here, that evidence showed that the two Logisticon guidance systems purchased by Monsanto were being used at the BBZ warehouse exactly as they were intended to be used on an orderpicker with which Logisticon claimed they were compatible. Based on the representations of Logisticon's salesman, no guidewheels or rails had been installed, as they were thought to be unnecessary. Plaintiff was trained to operate her orderpicker properly, and there was nothing to suggest that operator error played any role in what occurred. At the time of plaintiff's accidents, the guidance systems on the two orderpickers, including the one driven by plaintiff, had been in actual operation for fewer than 290 hours over less than five months. They had been subjected to no abnormal use and had been properly maintained. The guidance systems on both of the orderpickers had, however, already developed a history of chronic problems with their electronic power steering and guidance subsystems. Indeed, on at least three prior occasions, orderpickers had "jumped the wire" and collided with the shelving. When plaintiff's orderpicker subsequently lost the wire and collided with the shelving as well, the guidance system was thus clearly failing to function in the manner reasonably to be expected in light of its nature and intended function. (See *Tweedy v. Wright Ford Sales, Inc.* (1976), 64 Ill. 2d 570, 574-75, 357 N.E.2d 449, 452.) Logisticon's own salesman testified at trial that it is not an acceptable function of the Path-

finder guidance system to run into shelving and that when it does so it is operating defectively.

Logisticon argues that a defect may not be inferred from the foregoing facts alone because a secondary cause, namely, a defect in the Crown orderpicker, was shown to exist. We agree that the evidence was sufficient to establish that the Crown orderpicker was also defective. Those defects were attributable to malfunctions in the deadman brake and TDR. As in the case of the guidance system, the precise problems with these components was never definitively explained, and there was some evidence that nothing at all was wrong with them. Nevertheless, other evidence showed that the deadman brake switch had already required replacement once; there is no doubt that the TDR, a self-contained, sealed unit, was replaced under warranty after plaintiff's accidents; and James Uetrecht, a vice-president of Crown responsible for engineering, told the jury that failure of the TDR could cause failure of the power steering. Based on this evidence, and considering: (1) the testimony of plaintiff as to problems with the deadman just prior to her accidents, (2) Mills' testimony regarding his test of the orderpicker on May 7, and (3) the interrogation of Ken Berry regarding the service performed by Allied on these components, there was ample basis for the jury to conclude that the TDR and deadman brake and hence, the orderpicker itself, were defective.

That the Crown orderpicker was defective does not preclude a finding that a defect also existed in the guidance system. Because Logisticon made further adjustments and repairs to the guidance system after plaintiff's accidents occurred and after the problems with the deadman brake and TDR were corrected, and because those adjustments and repairs were substantially similar to the ones made to the guidance system by Logisticon immediately following plaintiff's accidents, the jury could reasonably have concluded that both the guidance system and the orderpicker were in an unreasonably dangerous condition at the time of plaintiff's accidents and that both were a proximate cause of her injuries. In this regard, we note that proximate cause, like the existence of a defect, is ordinarily a question for the jury. (*Warren v. LeMay* (1986), 142 Ill. App. 3d 550, 570, 491 N.E.2d 464, 476.) We find no basis for overturning the jury's conclusion, and we therefore hold that the trial court did not err in refusing to direct a verdict for or grant judgment notwithstanding the verdict to Crown and Logisticon or to grant Logisticon a new trial on the ground that no defect was established.

In addition, even if the evidence was not sufficient to prove a defect in the guidance system's electronics, the jury could neverthe-

less have found the guidance system to be defective by virtue of Logisticon's failure to warn of the system's dangerous propensities. A product may be unreasonably dangerous if a manufacturer failed to warn or gave an inadequate warning of a condition which it knew or should have known was dangerous. (*Soto v. E. W. Bliss Division of Gulf & Western Manufacturing Co.* (1983), 116 Ill. App. 3d 880, 886, 452 N.E.2d 572, 577.) For there to be a duty to warn, it must be "objectively reasonable" to expect the user of the manufacturer's product to be injured in the manner in which the plaintiff was injured. (*Mason v. Caterpillar Tractor Co.* (1985), 139 Ill. App. 3d 511, 518, 487 N.E.2d 1043, 1048.) The determination of whether a duty to warn exists is a question of law and not of fact. *Genaust v. Illinois Power Co.* (1976), 62 Ill. 2d 456, 466, 343 N.E.2d 465, 471.

■ Here we find as a matter of law that a duty to warn did exist. The accident in this case was objectively foreseeable. The evidence clearly established that the Logisticon guidance system could not operate on its own power. It depended on the power steering hydraulics of the orderpicker to work. If that power source were cut off, the Logisticon system simply could not guide the unit. Moreover, unlike the Ray-Guide system manufactured by Raymond Corporation, Logisticon's system contained no safety device to automatically stop the orderpicker if it deviated from the guidewire.

Logisticon contends that the relationship between its guidance system and the orderpicker's power steering hydraulics was not fully understood until after plaintiff's accidents. The relationship is a rather fundamental one, however, and the Logisticon guidance system was specifically designed to be used on the Crown orderpicker as well as various other brands. We therefore believe that Logisticon should have realized that a failure of the Crown orderpicker could cause a failure of the Logisticon guidance system and hence a loss of steering.

Logisticon argues that it could not have foreseen that a loss of steering would result in injury to an operator. This contention strains credulity. The Logisticon guidance system and the orderpicker with which it was designed to be compatible were specifically intended for use in extremely narrow aisles. The orderpicker units weighed several tons. They were able to move at moderate speeds and to lift operators high into the air, yet had only limited space in which to operate. In this case the clearance measured only inches on either side. Although the operators of the orderpicker units had some protection from an overhead guard, they were essentially exposed. We therefore believe that Logisticon should have anticipated that the failure of the orderpicker which caused a loss of steering would result in collision with

the shelving and possible operator injury. In fact, the record showed that Logisticon had paid liability claims in at least two cases where employees were injured while operating forklifts equipped with Logisticon guidance systems and that it had paid seven other claims arising from malfunction of the Pathfinder electronic guidance system. Logisticon contends that information regarding these prior claims should not have been brought before the jury. The record shows, however, that Logisticon failed to properly object to this information, and the issue has therefore been waived.

Although Logisticon should have known of the dangerous propensities of the guidance system as set forth above, there is no question that it failed to provide any warning of these dangerous propensities to plaintiff. Accordingly, we must conclude that Logisticon's duty to warn plaintiff of the dangerous propensities of the Pathfinder guidance system was breached. Notwithstanding any other problems which may have existed with the guidance system, this breach was a sufficient basis upon which the jury could impose liability on Logisticon.

■■ Logisticon next argues that the jury's findings of 0% liability against Allied, 10% liability against Crown, and 15% and 10% liability on the respective third-party actions against Monsanto are contrary to the manifest weight of the evidence. This argument is wholly without merit. As a preliminary matter, we note that while Logisticon filed an action for contribution against Allied, it failed to tender any jury instructions regarding the elements of that action. This aside, a jury's apportionment of damages between joint tortfeasors will not be set aside as being against the manifest weight of the evidence unless all reasonable, intelligent minds would reach a different conclusion or unless it is clearly evident that jurors have reached a wrong conclusion or an incorrect result. (*Kohutko v. Four Columns, Ltd.* (1986), 148 Ill. App. 3d 181, 189, 498 N.E.2d 522, 528.) Logisticon cites no authority to suggest that this standard has been met on the circumstances present here. Instead it merely reiterates its version of the facts, concluding that it could not be held responsible for plaintiff's injuries. Given our previous discussion as to Logisticon's liability, we find this to be an insufficient basis for disturbing the jury's verdict.

Logisticon further argues that it should be granted a new trial because of a series of errors committed by the trial court with respect to the admission and exclusion of certain evidence. Among the errors claimed are the trial court's rulings: (1) allowing objections to a number of questions asked to Dr. Hanaway and to Dr. Walker at their depositions, thus preventing those questions and their answers from

being read to the jury; (2) allowing plaintiff's counsel to ask leading questions to Richard Fellows, Logisticon's salesman, even though Fellows was called as a witness by plaintiff; (3) allowing Crown's attorney to ask leading questions to Tom Schaefer, who was in charge of stock and delivery of stock at the BBZ warehouse at the time of plaintiff's injuries, even though Schaefer was called as a witness by Crown; and (4) allowing the admission into evidence of a Logisticon service report showing repairs done on the guidance system on Monsanto's orderpickers subsequent to plaintiff's accidents. Discussion of Logisticon's arguments with respect to these alleged errors would serve no purpose. After careful review of the record, we have found them to be completely without merit. Two further claims by Logisticon, however, warrant more detailed consideration.

The first deals with the testimony of Kevin Berry, the Allied repairman called to the BBZ warehouse on May 7, 1981, to work on unit 2's deadman brake and TDR. The record shows that Logisticon had requested in discovery that Allied disclose the identity of any employee who had been on the scene of plaintiff's accidents. Allied, however, did not reveal Berry's involvement in this matter until just before trial, and Logisticon was unable to ascertain his knowledge of what had gone wrong with the orderpicker until a deposition was taken after trial had commenced. Logisticon filed a motion *in limine* to bar Berry's testimony, but that motion was denied. Logisticon now asserts that denial of its motion *in limine* constituted reversible error, because the belated disclosure of Berry's identity and the testimony he presented required it to modify its theory of the case after opening argument had been presented, thus subjecting it to surprise and prejudice.

Although we cannot condone Allied's conduct in failing to make a full and timely response to Logisticon's proper discovery requests, we do not believe that a new trial is mandated. While sanctions may be imposed against a party where it has failed to comply with discovery requests and such noncompliance is unreasonable (87 Ill. 2d R. 219(c)), the imposition of sanctions rests with the sound discretion of the trial court, whose decision will not be disturbed on review absent a clear abuse of that discretion. (*Ford v. City of Chicago* (1985), 132 Ill. App. 3d 408, 415, 476 N.E.2d 1232, 1238.) Here, the sanction of barring the testimony of Berry would not have served to punish Allied, the offending party, for it was not Allied who called Berry to testify. Berry was instead called by plaintiff. There is no evidence that plaintiff knew of Berry's existence, much less his knowledge of the case, any earlier than Logisticon, and both plaintiff and

Logisticon were given an equal opportunity to depose Berry prior to his appearance before the jury. Moreover, the testimony ultimately presented by Berry, taken as a whole, actually lent support to Logisticon's theory that it was defects in Crown's orderpicker, as opposed to Logisticon's guidance system, which caused plaintiff's accidents. Under these circumstances, we fail to see how Logisticon suffered any significant prejudice, and we cannot say that allowing Berry to testify constituted an abuse of discretion.

■■■ Second, Logisticon asserts that the trial court erred in refusing to allow it to call as an expert witness Dr. Herbert Rosenbaum, a neurologist. Plaintiff had apparently been examined by Rosenbaum at Monsanto's request in connection with her workers' compensation claim, and, according to Logisticon, his was the last documented medical examination of plaintiff prior to trial. The record shows that on July 2, 1984, the trial court issued an order requiring all parties to reveal their experts within 30 days and to schedule their depositions within 60 days. At the end of that month, Monsanto advised plaintiff's counsel, *inter alia*, that it might call as experts any and all of the "treating and examining physicians whose identities have heretofore been disclosed in this matter" and forwarded to him a copy of a report made by Rosenbaum in June of 1984. Plaintiff's counsel then submitted interrogatories to Monsanto regarding Rosenbaum and notified the parties that he would take Rosenbaum's deposition. The interrogatories were never answered, however, and the deposition was never taken because Monsanto subsequently advised plaintiff's counsel that Rosenbaum would not be called by it as a witness at trial.

Logisticon, for its part, did not express any desire at any time prior to trial to call Rosenbaum as part of its case. Although Logisticon sent a notice to plaintiff's attorney dated July 31, 1984, stating generally that "[i]n addition to those witnesses disclosed by plaintiff *** and her attorney and defendant Monsanto Company," it might call medical, vocational, rehabilitation, economic, and engineering professionals, it sent another letter three weeks later specifically listing as its expert witnesses only Dr. Walker and James England, the vocational rehabilitation counselor. Logisticon's intention to add Rosenbaum to this list was not made known to plaintiff until the trial was more than halfway over.

As with the decision to impose sanctions for an unreasonable failure to comply with discovery requests, the decision to allow or exclude expert testimony is a matter committed to the sound discretion of the trial court. (*Appelgren v. Walsh* (1985), 136 Ill. App. 3d 700, 703, 483 N.E.2d 686, 689.) The discretion given to the trial court is

broad and will not be interfered with unless it appears to have been abused. (136 Ill. App. 3d 700, 705, 483 N.E.2d 686, 690.) The factors to be considered by the trial court in making its decision include surprise to the adverse party, the prejudicial effect of the testimony, the nature of the testimony, the diligence of the adverse party, the timely objection to the testimony, and the good faith of the party calling the witness. 136 Ill. App. 3d 700, 704, 483 N.E.2d 686, 689, citing *Ashford v. Ziemann* (1984), 99 Ill. 2d 353, 369, 459 N.E.2d 940, 947-48.

In this case, Monsanto's attorney admitted that he had not given prior notice to Logisticon of his decision not to use Rosenbaum's testimony, and no suggestion has been made that Logisticon's belated decision to call Rosenbaum was the product of bad faith. Plaintiff's attorney knew that Rosenbaum had examined his client, and he was given the opportunity to take Rosenbaum's deposition after trial had begun. Nevertheless, in light of the express representations previously made by both Monsanto and Logisticon regarding their expert witnesses, there can be no doubt that plaintiff's counsel was taken completely by surprise by the request to adduce Rosenbaum's testimony at trial, and he cannot be faulted for any lack of diligence for failure to undertake pretrial discovery regarding Rosenbaum's knowledge of the case.

Logisticon asserts that since plaintiff was permitted to call Kevin Berry it should have been allowed to call Rosenbaum, but the circumstances surrounding these witnesses were quite different. Berry's identity was unknown to plaintiff until just before trial, and he could not have been designated as a witness for plaintiff any earlier. Rosenbaum's identity, however, was known to Logisticon far in advance of trial, yet Logisticon apparently made a conscious decision not to list him as a witness on its behalf until after trial was well underway. Monsanto's admission that it had not advised Logisticon in advance that it would not use Rosenbaum as part of its case is no excuse. In view of the court's order specifically requiring each party to make full disclosure of the expert witnesses it intended to use at trial, Logisticon was not justified in relying on its perception of what the other parties would or would not do. Logisticon could easily have avoided any problem here simply by placing Rosenbaum on its own witness list pursuant to the court's order. For reasons known only to it, however, it simply failed to do so.

Logisticon attempts to avoid the question of noncompliance with the court's order regarding experts by arguing that it intended to call Rosenbaum as a treating physician, not simply as an expert, and that its initial letter to plaintiff's attorney listing generally the

witnesses it would call was sufficient to place plaintiff on notice regarding Rosenbaum. Without addressing the merits of this contention, we note simply that it was raised for the first time in Logisticon's reply brief and was unsupported by citation of authority. We therefore consider the issue to be waived. See *People ex rel. Rappaport v. Drazek* (1975), 30 Ill. App. 3d 310, 317, 332 N.E.2d 532, 538.

■■ There are other reasons why the proffered testimony of Berry and Rosenbaum are distinguishable. Berry's identity was disclosed before trial commenced, and he testified before Logisticon had even begun presenting its case. Logisticon therefore still had at least some opportunity to modify its trial strategy to account for any unexpected revelations Berry may have made. By contrast, the fact that Rosenbaum would be called by Logisticon was not disclosed until after plaintiff had adduced all of her medical evidence and concluded her case in chief. Her ability to investigate Rosenbaum's testimony and to rebut that testimony was therefore much more limited. The disadvantage at which plaintiff was thus placed was particularly significant given the prejudicial nature of Rosenbaum's anticipated testimony. While, as previously noted, Berry tended to implicate Crown and not Logisticon, the party opposing his testimony, the record suggests that Rosenbaum would have given evidence directly challenging the medical testimony presented by plaintiff regarding the extent and origin of her injuries. Plaintiff's counsel made a timely objection to the use of Rosenbaum as a witness, and, under the foregoing circumstances, we find no abuse of discretion in the trial court's decision to bar his testimony.

Before leaving this issue, we must observe that Supreme Court Rule 220(b) (103 Ill. 2d R. 220(b)) now imposes an affirmative obligation on all parties to disclose their experts and to do so in a manner designed to insure that discovery of the experts can be completed before trial is expected to commence. That rule expressly provides:

> "Failure to make the disclosure required by this rule or to comply with the discovery contemplated herein will result in disqualification of the expert as a witness." 103 Ill. 2d R. 220(b).

The rule was not yet in effect when the trial court here issued its order regarding the disclosure of the parties' experts, but did become effective two weeks before trial began. The parties have not briefed the issue of whether the rule should be applied on the facts of this case. We need not decide this issue, however, for our conclusion would remain the same. Under the new rule, as well as under preexisting law, the trial court acted properly in refusing to permit Rosenbaum to testify.

■■ Logisticon next asserts that it should be granted a new trial because of various improper remarks and arguments before the jury by the attorneys for plaintiff, Crown, and Allied. Again, we do not believe that a detailed discussion of these remarks and arguments would serve any purpose. The record shows either: (1) that Logisticon failed to make an objection, thus waiving its right to object on appeal (*Reynolds v. Alton & Southern Ry. Co.* (1983), 115 Ill. App. 3d 88, 99, 450 N.E.2d 402, 410); (2) that Logisticon did promptly object and its objection was sustained, thus rendering any prejudice harmless (115 Ill. App. 3d 88, 99, 450 N.E.2d 402, 411); (3) that it waived its right to object on appeal by failing to support its claim of error with any citation of authority (see *Professional Group Travel, Ltd. v. Professional Seminar Consultants, Inc.* (1985), 136 Ill. App. 3d 1084, 1092, 483 N.E.2d 1291, 1296); (4) that the challenged statement constituted a reasonable inference or conclusion properly drawn from the evidence and thus was within the permissible scope of argument (see *Carlasare v. Wilhelmi* (1985), 134 Ill. App. 3d 1, 7, 479 N.E.2d 1073, 1077); or else (5) that the challenged statement was not so inflammatory and prejudicial, individually or in connection with the other allegedly improper remarks and arguments (see 134 Ill. App. 3d 1, 6, 479 N.E.2d 1073, 1077), and was not so "replete with improper accusations" (see *Burke v. Toledo, Peoria & Western R.R. Co.* (1986), 148 Ill. App. 3d 208, 214, 498 N.E.2d 682, 687) that Logisticon was denied a fair trial.

Logisticon further complains that the judgment should be reversed because certain of the jury instructions were improper. We disagree. Over Logisticon's objection, the court gave to the jury a version of Illinois Pattern Jury Instruction, Civil, No.12.04 (2nd ed.1971) (hereinafter IPI Civil 2d), regarding proximate cause, which did not include the second paragraph. That paragraph provides that if the jury should find that "the sole proximate cause of injury to the plaintiff was the conduct of some person other than the defendant, then your verdict should be for the defendant." IPI Civil 2d No.12.04.

■■ Logisticon contends that there was some evidence showing that plaintiff's accidents were caused by the defective TDR, whose manufacturer was not a party to the suit, and that the second paragraph therefore should have been given. Our supreme court has made clear, however, that the paragraph should be used only where there is some evidence tending to show that the *sole* proximate cause of the occurrence was the conduct of a third person. (See *Ballweg v. City of Springfield* (1986), 114 Ill. 2d 107, 121, 499 N.E.2d 1373, 1379.) Such is not the case here. We find nothing in the record to suggest that the TDR could possibly have contributed to plaintiff's accidents had the

deadman brake not also been defective. Omission of the second paragraph was, for this reason, entirely proper.

■■ Another instruction challenged by Logisticon provided:

"The manufacturer of a product has a duty to communicate warnings regarding the use of the product which he knows or should anticipate are reasonably necessary for the safe use of the product. The law does not say what warnings are reasonably necessary or how long they should be communicated. That is for you to decide."

The basis for Logisticon's objection to this instruction is IPI Civil 2d No. 400.07 (Supp. August 1986), which states simply: "The Committee recommends that no instructions on 'duty to warn' or 'duty to instruct' be given." Despite the committee's recommendation, we have not found, nor has Logisticon cited, any case law or court rule which prohibits the use of such instruction. The instruction states the law of Illinois with substantial accuracy, and there is nothing before us to indicate that it "clearly misled the jury." See *King v. Casad* (1984), 122 Ill. App. 3d 566, 572, 461 N.E.2d 685, 689.

Logisticon also takes exception to each of the following instructions:

"If you decide that the plaintiff has proved all of the propositions of his case, then it is not a defense that care was used in the manufacture of orderpicker and/or the Pathfinder guidance system." Plaintiff's Instruction No.13.

"The manufacturer of a product is under a non-delegable duty to make a product that is reasonably safe; it may not delegate that duty to the dealer, user or purchaser of the product." Plaintiff's Instruction No.14.

"If you find for the plaintiff and against the defendant or defendants, it is not a defense that a lack of care by a physician may have aggravated plaintiff's damages. The law regards an injury which is aggravated by the care of a physician as part of the immediate and direct damage which flow [*sic*] from the injury." Plaintiff's Instruction No.21.

Logisticon does not dispute that these three instructions accurately state the law. Rather, it contends that their use was prejudicial and requires reversal of the judgment because there was no evidence to support them. For the same reason, Logisticon cites as reversible error the use of a fourth instruction, plaintiff's instruction No.18, which set forth plaintiff's allegations as to why she believed the Pathfinder guidance system to be unreasonably dangerous.

■■ Although "it is reversible error for a court to instruct a jury

on an issue that is unsupported by the evidence" (see *In re Estate of Loesch* (1985), 134 Ill. App. 3d 766, 771, 481 N.E.2d 32, 36), we find ample support for each of the four instructions at issue in this case. Plaintiff's instruction No.13 is a version of IPI Civil 2d No. 400.10 (Supp. August 1986), which is to be given "if the jury has heard from suggestion, evidence, or argument that the defendant exercised care in the manufacturing process." (Notes on Use, IPI Civil 2d No.400.10, at 400—29 (Supp. August 1986).) Here, the jury did hear evidence that when the orderpicker left the Crown factory it was in compliance with standards promulgated by the American National Standards Institute and that Crown's vehicle was the "Cadillac" of orderpickers. The jury also saw literature from both Crown and Logisticon touting the safety, quality, and durability of their respective products. In our view, these matters raised on inference of the exercise of care in the manufacture of the products sufficient to justify use of the instruction.

Plaintiff's instruction No.14 was proper given that Logisticon did attempt to shift responsibility to Allied, the dealer, and Monsanto, the purchaser, by, *inter alia*, questioning the adequacy of maintenance of the orderpicker and the training of its operators, and in view of the decision by Monsanto not to install guidewheels and rails on the orderpicker. See *Soto v. E. W. Bliss Division of Gulf & Western Manufacturing Co.* (1983), 116 Ill. App. 3d 880, 894-95, 452 N.E.2d 572, 582-83.

There was likewise no error in using plaintiff's instruction No. 21. The primary basis for this instruction was the disagreement in diagnosis between Dr. Walker and Dr. Geise from which the jury may have concluded that the surgery performed on plaintiff for a ruptured disc was not necessary. As for plaintiff's instruction No. 18, we believe that this instruction was entirely proper in light of our previous conclusion that a jury question existed as to whether Logisticon's guidance system was in an unreasonably dangerous condition when it left Logisticon's control.

The final argument raised by Logisticon as to why it should be granted a new trial is that the amount of damages awarded to plaintiff "is beyond the flexible means of what is reasonably supported by the evidence." Again we disagree. The compensation to be awarded for personal injuries is a question of fact for the jury. If the jury has been correctly instructed on the elements measuring damages and if there is no showing that the size of the verdict is the result of either passion or prejudice or the result of the jury having overlooked an element of damages, then the amount awarded will not

be disturbed. *Carlasare v. Wilhelmi* (1985), 134 Ill. App. 3d 1, 8, 479 N.E.2d 1073, 1078.

Logisticon does not dispute that the jury was properly instructed as to the elements of damage for which plaintiff could be compensated. As our previous discussion of the evidence has shown, plaintiff was 37 years old at the time of trial and had a life expectancy of 42.7 years. Once an industrious worker, she is now permanently disabled and in constant pain. No longer can she share a bed with her husband, nor is she able to perform routine household chores without assistance. Her existence has become largely sedentary. She has gained 30 pounds. She must take narcotic medication to ease her discomfort. Despite physical therapy and multiple operations, plaintiff continues to suffer, and she is likely to require additional surgery in the future. At the time of trial, she had already expended more than $29,000 for medical care and had lost more than $26,000 in wages. Expert testimony indicated that the sum presently required to compensate her for future lost wages might be as high as $653,380. Under these circumstances, we believe that the jury's award of $1,250,000 is amply supported by the evidence, and we find no indication that it was the product of passion or prejudice. That award shall stand.

We turn at last to the appeal of third-party defendant Monsanto. In this case, Logisticon and Crown each sought and obtained contribution from Monsanto based on the theory of assumption of risk. Their complaints alleged, *inter alia,* that Monsanto knew that the orderpicker was not reasonably safe to use on May 4, 1981, the day before plaintiff's first accident, but that it nevertheless knowingly allowed the unit to remain in service and to be operated by plaintiff before the necessary repairs and adjustments were made.

Monsanto does not dispute that an employer may now be sued in contribution by third-party manufacturers who were partially responsible for injuries suffered by its employee when the conduct of the employer constituted assumption of the risk of the manufacturer's defective product. (*Dukes v. J. I. Case Co.* (1985), 137 Ill. App. 3d 562, 586, 483 N.E.2d 1345, 1361; *Lowe v. Norfolk & Western Ry. Co.* (1984), 124 Ill. App. 3d 80, 97, 463 N.E.2d 792, 805.) No argument has been made that the allegations by Logisticon and Crown failed to state valid causes of action. The sole basis for Monsanto's appeal is that the evidence was insufficient as a matter of law to warrant submission of those causes of action to the jury and that a directed verdict or judgment notwithstanding the verdict should therefore have been granted.

Monsanto first denies that it had prior knowledge that anything was wrong with the orderpicker. As our summary of the record indicates, however, there was evidence to show that plaintiff had complained to her foreman of problems with the deadman brake during the two- or three-day period prior to her first accident on May 5 and that Monsanto reported to Logisticon on May 4 that plaintiff's orderpicker "was going off track." Monsanto correctly points out that there is conflicting evidence on this matter. Nevertheless we cannot say that the evidence so overwhelmingly favors Monsanto that no contrary verdict based on that evidence could ever stand. See *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14.

Monsanto asserts, in the alternative, that even if it knew of some defect, it did not appreciate the danger which that defect posed. The test to be applied in determining whether an employer has assumed the risk of injury from a product known to be defective is fundamentally a subjective one in the sense that it is the employer's knowledge, understanding, and appreciation of the danger which must be assessed, rather than that of the reasonably prudent person. This determination, however, ordinarily presents a question of fact for the jury to decide. The determination is not to be made solely on the basis of the employer's own statements (through its agents and employees), but rather upon the jury's assessment of all of the facts established by the evidence. No juror is compelled to accept an employer's assertion that it was unaware of the danger if, in light of all of the evidence, it could not have been unaware of the hazard. See *Williams v. Brown Manufacturing Co.* (1970), 45 Ill. 2d 418, 430-31, 261 N.E.2d 305, 312; see also Restatement (Second) of Torts sec. 496D, comments *c, d, e* (1965).

The jury here did hear evidence that Monsanto's personnel were never advised of the risk of injury and that they would not have purchased the equipment had they been told that it would periodically fail and crash into the shelving. The jury also heard, however, that Monsanto had experienced chronic problems with the orderpickers and that, on three prior occasions shortly before plaintiff's first accident, orderpickers had crashed into shelving after leaving the guidewire. To be sure, no operator injury had resulted from those accidents. Nevertheless, as noted in connection with Logisticon's liability to plaintiff, the orderpicker weighed several tons, traveled through narrow aisles stocked with loose spare parts and supplies at speeds of up to five or six miles per hour, had minimal side-to-side clearance, and was equipped with an operator's compartment which was essen-

tially open and could be raised off the ground while the unit was in motion. In light of these facts, we believe that a jury could reasonably have determined that Monsanto could not have been unaware that the problems with the orderpicker reported just before plaintiff's accident could, if not corrected, result in serious injury to an operator.

Monsanto suggests in its brief that it cannot be held to have assumed the risk here because no showing was made that it knew of the precise cause of the defect in question. We have found no authority requiring such a showing. Monsanto cites *Collins v. Musgrave* (1975), 28 Ill. App. 3d 307, 328 N.E.2d 649, in support of its position, but that case is inapposite. *Collins* involved an accident which resulted when the rear axle assembly of a truck failed. The owner and operator of the truck brought an action in strict liability against the manufacturer and installer of the assembly, and defendants raised the affirmative defense of assumption of risk and misuse. With respect to the issue of assumption of risk, the evidence showed that the truck's operator had experienced a problem with the vehicle on a previous occasion and had some knowledge of automobile mechanics; however, prior to the accident he had taken the truck to the installer with instructions to repair everything that was wrong. The new rear axle assembly was then installed, and the truck was returned "upon an implicit assurance that repairs were complete and that the truck was safe for normal use." (28 Ill. App. 3d 307, 313, 328 N.E.2d 649, 653.) This was the critical factor in the case. Invoking the general rule that "if plaintiff surrenders his better judgment upon an assurance, whether explicit or implicit, that the situation is safe, will be remedied, or upon a promise of protection, he does not assume the risk" (28 Ill. App. 3d 307, 313, 328 N.E.2d 649, 653), the court determined that the installer's implicit assurance that there was no danger meant that plaintiffs could not be held to have assumed the risk of harm. (28 Ill. App. 3d 307, 313, 328 N.E.2d 649, 653.) In the case before us, no such assurances were given prior to plaintiff's first accident. To the contrary, the evidence showed that Monsanto allowed plaintiff to use the orderpicker on the morning of May 5 before any repairman had even examined it.

Not until plaintiff had suffered her first accident was the orderpicker removed from service by Monsanto and tested by a repairman. That repairman, Merrill Lewis from Logisticon, was, as on previous tests after earlier accidents, unable to duplicate what had happened or to make a conclusive diagnosis of the problem. He noted that the unit was intermittently losing rear guidance, made certain adjustments to the guidance system, and left. When he returned the following morn-

ing, he found that the guidance system still had problems. He therefore conducted further tests, made additional adjustments, and left again. None of the "repairs" he performed were different in kind from those which had been made before. Although experience had shown that such repairs were unsuccessful in curing the problem, nothing further was done. In addition, despite plaintiff's complaints regarding the deadman brake, no representative from Allied was called to check it, and the problem with that component remained unknown. Nevertheless, Monsanto returned the orderpicker to service, and once more plaintiff was injured while operating it.

&#9646;&#9646; Monsanto seems to suggest that it understood Lewis' departure from the warehouse after his two examinations of the unit to constitute at least an implicit assurance that the unit could be operated safely. Even if this were true, and the jury could certainly have believed otherwise, it would not by itself insulate Monsanto from liability under *Collins v. Musgrave* (1975), 28 Ill. App. 3d 307, 328 N.E.2d 649, for plaintiff's second accident. The mere receipt of assurances that a dangerous situation is safe does not automatically protect an employer from a claim of assumption of risk. Reliance on the assurance must be reasonable. See W. Prosser, Torts sec. 68, at 450 (4th ed. 1971).

Here, assurances had been made by Logisticon service personnel before, but, as we have pointed out, the type of corrective action taken did not change, problems persisted, and accidents resulted, culminating in an injury to one of Monsanto's employees. Under these circumstances, a jury surely could have concluded that by the time plaintiff's second accident took place, any reliance by Monsanto on Logisticon's assurances had simply become unreasonable.

A final claim made by Monsanto is that in order to prevail against it on a theory of assumption of risk, Logisticon and Crown were also required to prove that it knew of a means within its control to make the orderpicker safe, but chose to forego that means. Whether such proof was required or adduced will not be addressed, however, for the issue has been raised for the first time on appeal and has therefore been waived. *Western Casualty & Surety Co. v. Brochu* (1985), 105 Ill. 2d 486, 500, 475 N.E.2d 872, 879.

For the foregoing reasons, the judgment of the circuit court of St. Clair County is affirmed.

Affirmed.

KARNS, P.J., and WELCH, J., concur.