J-A25035-16

2017 PA Super 10

| | | |
|---|---|---|
| JEFFREY HIGH | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| PENNSY SUPPLY, INC. | : | No. 411 MDA 2016 |
| v. | : | |
| | : | |
| | : | |
| CHARLES W. HIGH, II | : | |

Appeal from the Order Entered February 18, 2016
In the Court of Common Pleas of Dauphin County
Civil Division at No(s):  2013-CV-6181-CV,
2013-CV-6206-CV

| | | |
|---|---|---|
| CHARLES W. HIGH, II | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| PENNSY SUPPLY, INC. | : | No. 416 MDA 2016 |
| v. | : | |
| | : | |
| | : | |
| JEFFREY HIGH | : | |

Appeal from the Order Entered February 18, 2016
In the Court of Common Pleas of Dauphin County
Civil Division at No(s):  2013-CV-6181-CV,
2013-CV-6206-CV

BEFORE:  FORD ELLIOTT, P.J.E., SHOGAN, J., and STEVENS[*], P.J.E.

OPINION BY STEVENS, P.J.E.:                    **FILED JANUARY 13, 2017**

*Former Justice specially assigned to the Superior Court.

Appellants Jeffrey and Charles High (collectively "the High brothers") appeal from the order entered by the Court of Common Pleas of Dauphin County granting Appellee Pennsy Supply Inc.'s Motion for Summary Judgment. The High brothers claim that the trial court erred in refusing to allow a jury to decide as factfinder whether wet concrete is a defective product unreasonably dangerous to the consumer pursuant to the standards set forth in **Tincher v. Omega Flex**, 628 Pa. 296, 104 A.3d 328 (2014).[1] After careful review, we reverse and remand for further proceedings.

The underlying lawsuit arose from injuries the High brothers sustained in an incident that occurred on November 9, 2012. Jeffrey High had ordered the delivery of four cubic yards of concrete from Pennsy Supply to create a floor in a three-foot high crawlspace in the basement of his residence. Mike Holley, a Pennsy Supply supervisor, had advised Jeffrey to purchase flowable fill concrete, which is characterized as self-leveling. Given the tight space in which the floor would be poured, the men agreed that flowable fill concrete would work better than regular concrete in this case as it would involve less work to create a level floor in the tight space. After this conversation, Jeffrey believed he had ordered flowable fill concrete.

---

[1] The author of this opinion was a member of the Pennsylvania Supreme Court that decided the **Tincher** case and has now been specially assigned to the Superior Court. We note that the parties seek to apply the principles set forth in **Tincher** to a particular set of facts and do not in any way question the validity of the **Tincher** decision.

On the day of the scheduled delivery, Jeffrey arranged for his brother, Charles High, to assist him as the concrete floor was poured. When the concrete truck arrived, the driver for Pennsy Supply presented Jeffrey with a delivery ticket that contained the following warning:

> **WARNING: IRRITATING TO SKIN AND EYES.**
> **Contains Portland Cement. Avoid contact with eyes and prolonged contact with skin. Wear rubber boots and gloves. In case of contact with skin or eyes, flush thoroughly with water. If irritation persists, get medical attention. Keep children away.**

Pennsy Supply Delivery Ticket, 11/9/12. Jeffrey placed his signature below this warning and also signed the bottom of the ticket to authorize the charges for the concrete delivery. Charles did not see the warning on the delivery ticket but admitted he was aware of similar warnings about possible skin irritation from his prior use of bagged concrete. In those instances, Charles recalled his skin coming into direct contact with concrete; however, this exposure only caused Charles's skin to be a "little dry" and did not cause any burns or noticeable injury. Deposition of Charles High (Charles High Dep.), 47:18–48:1, January 14, 2015.

In preparation for the delivery, Jeffrey did not wear gloves or rubber boots as he believed the concrete's self-leveling property would minimize the need to have direct contact with the concrete. Charles wore work gloves, several layers of clothes, and leather shoes with plastic bags on top. Charles indicated he wore the bags on his shoes so that his pants and shoes would be easier to clean after the task was completed.

After the first section of concrete was poured from the delivery truck, the High brothers noticed that the concrete surface was wavy, but they assumed that it took time to level. After the men observed that the second poured section of concrete also was not level, Jeffrey questioned the delivery driver, David Smith, about the set and dry time of the concrete. In talking with Smith, Jeffrey realized that the truck was carrying regular concrete, not flowable fill concrete. Nevertheless, at that point, Jeffrey felt he had no choice but to accept the remaining concrete and try to level it with tools he had available. The men admitted to using rakes, boards, and their forearms to smooth the concrete, kneeling in the concrete at times in the confined space. After the High brothers worked in the crawlspace for approximately ninety minutes, their clothes became saturated with wet concrete.

On a break, when Jeffrey washed his hands with a hose and wiped his hands, he observed his skin peel off. At this discovery, the men stopped the concrete work. Charles went into the shower to get the concrete from his body and realized the skin on his legs was turning black. The brothers did not seek medical treatment immediately. Charles attempted to treat his injuries by soaking in a tub with water, vinegar, and sea salt as directed by Jeffrey, who found this suggestion on the internet.

Both brothers were subsequently taken by ambulance for medical care and admitted at Lehigh Valley Medical Center for inpatient treatment as they had sustained both second and third degree chemical burns, which required surgery for the excision of the third degree burns with allograft placement.

Charles and Jeffrey respectively allege that they sustained burns to approximately 15.0% and 10.77% of their total body surface area. Charles's medical records indicate that his attempt to treat his injuries with a bath mixed with vinegar and sea salt caused an exothermic reaction that worsened his symptoms.

On July 17, 2013, the High brothers filed separate strict products liability actions claiming the concrete Pennsy Supply had sold Jeffrey High was a product in a defective condition unreasonably dangerous to consumers. Specifically, the High brothers alleged that the concrete delivered by Pennsy Supply had a pH of 12.4 and noted that "alkalis with a pH greater than 11.5 produce severe tissue injury [chemical burns] through liquefaction necrosis." Jeffrey High Compl. at ¶ 6, 8; Charles High Compl. at ¶ 6, 8. On September 17, 2013, Pennsy Supply filed an answer containing new matter, alleging, *inter alia,* that the High brothers were aware of the dangers of concrete, did not adhere to the warnings on the delivery ticket, and caused their injuries by their misuse or abuse of the product. Pennsy Supply also alleged it was not liable to Charles High as he was a sophisticated user of concrete. On September 27, 2013, the High brothers filed replies to Pennsy Supply's new matter. On October 15, 2013, Pennsy Supply filed a complaint joining Charles High as a defendant, alleging that Charles was a sophisticated user of concrete and was negligent in failing to take adequate precautions and in encouraging careless use of the concrete by Jeffrey High. On June 16, 2014, the trial court consolidated the actions.

On June 30, 2015, Pennsy Supply filed a motion for summary judgment, claiming the High brothers could not prove the concrete was in a defective condition unreasonably dangerous to the intended user. Specifically, Pennsy Supply asserted that the High brothers did not present expert reports showing that there was any defect in the concrete, anything unusual about this particular batch of concrete, any manufacturing defect, or any indication that Pennsy Supply's warnings were inadequate. Rather, Pennsy Supply suggested that the high pH of concrete is an inherent property that is necessary for the product to perform as expected.

Both brothers filed similar responses, asserting the concrete was in a defective condition unreasonably dangerous to the intended user as the danger created by the concrete's high pH was unknowable and unacceptable to the average consumer. While Jeffrey High acknowledged Pennsy Supply's delivery ticket contained a warning, he suggested the given statement was inadequate as it only warned of mere skin irritation and did not inform the user of the possibility of sustaining third-degree chemical burns. Jeffrey also claimed he had no reason to believe he should wear protective clothing, as a Pennsy Supply representative had assured him he would not have much exposure to self-leveling concrete. Jeffrey argued that the men were forced to work with the concrete in the confined crawlspace after discovering the product was not self-leveling. Similarly, Charles High claimed he was unaware of the danger of the concrete's high pH as he was not provided with any warning by Pennsy Supply. Charles sustained third degree burns from

his exposure to the concrete despite wearing gloves, several layers of clothing, and plastic bags over his leather shoes.

Thereafter, the trial court entered an order granting summary judgment to Pennsy Supply, after concluding the High Brothers could not prove that wet concrete is in a defective condition unreasonably dangerous to consumers. On March 11, 2016, the High Brothers filed this appeal.

Appellant Jeffrey High raises the following question for review:

Whether the lower court committed an error of law when it determined as a matter of law that [Appellant] Jeffrey High cannot prevail on a claim for defective product under the Consumer Expectations Standard when he relied on [Pennsy Supply] to supply self-leveling concrete, [Appellant Jeffrey High] was not a professional contractor, and neither [Pennsy Supply], its written warning, or its agents ever notified [Appellant Jeffrey High] of a risk of chemical burns?

Brief for Jeffrey High, at 5.

Appellant Charles High phrases a similar challenge in terms of the following issues:

A. Whether the lower court committed an error of law because it did not properly apply *Tincher v. Omega Flex*, 104 A.3d 328 (Pa. 2014).

B. Whether the lower court made findings of fact that should have been reserved for the jury.

C. Whether the lower court failed to properly apply the Consumer Expectations test from *Tincher* when it determined as a matter of law that the concrete at issue was not a defective product.

D. Whether the lower court committed an error of law when it determined as a matter of law that the concrete at issue was not a defective product.

E. Whether the lower court committed an error of law when it applied and/or relied upon cases from out-of-state jurisdictions as it analyzed the Consumer Expectations test and its applicability to the facts of this case.

F. Whether the lower court's decision is against public policy.

Brief for Charles High, at 5.

In reviewing a trial court's decision to grant summary judgment, our standard review is as follows:

As has been oft declared by this Court, summary judgment is appropriate only in those cases where the record clearly demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. When considering a motion for summary judgment, the trial court must take all facts of record and reasonable inferences therefrom in a light most favorable to the non-moving party. In so doing, the trial court must resolve all doubts as to the existence of a genuine issue of material fact against the moving party, and, thus, may only grant summary judgment where the right to such judgment is clear and free from all doubt.

On appellate review, then, an appellate court may reverse a grant of summary judgment if there has been an error of law or an abuse of discretion. But the issue as to whether there are no genuine issues as to any material fact presents a question of law, and therefore, on that question our standard of review is *de novo.* This means we need not defer to the determinations made by the lower tribunals. To the extent that this Court must resolve a question of law, we shall review the grant of summary judgment in the context of the entire record.

*Allen-Myland, Inc. v. Garmin Int'l, Inc.*, 140 A.3d 677, 682 (Pa.Super. 2016) (quoting *Summers v. Certainteed Corp.,* 606 Pa. 294, 307, 997 A.2d 1152, 1159 (2010) (internal citations and quotation marks omitted)).

Our courts have provided that plaintiffs seeking relief under a strict product liability cause of action must prove that "the product was defective,

- 8 -

the defect existed when it left the defendant's hands, and the defect caused the harm." ***Barton v. Lowe's Home Centers, Inc.***, 124 A.3d 349, 354–55 (Pa.Super. 2015). A product may be found to be defective based on proof of any one of three conditions: a manufacturing defect in the product itself, a defect in the product's design, or a failure of the manufacturer to warn of the product's danger or to instruct on the proper use of the product. ***Weiner v. Am. Honda Motor Co.***, 718 A.2d 305, 307 (Pa.Super. 1998).

As an initial matter, we note that much of the confusion in this case appears to come from the fact that the High brothers never expressly identified the specific theory of strict liability they wish to pursue. At first glance, the High brothers appear to raise a design defect claim by contending the trial court erred in refusing to follow the dictates of ***Tincher,*** which involved a design defect claim. ***Tincher,*** 628 Pa. at 390, 104 A.3d at 384, n.21 (clarifying that the decision is "limited to the context of a 'design defect' claim by the facts of this matter, albeit the foundational principles upon which we touch may ultimately have broader implications by analogy").

However, while the High brothers have suggested that they are raising a design defect claim, the High brothers' argument is centered on their assertion that the concrete was defective because Pennsy Supply failed to warn them of the concrete's potential to cause third degree burns.[2] The

---

[2] We note that the Supreme Court granted allocatur in ***Amato v. Bell & Gossett***, ____Pa.____, 130 A.3d 1283 (Pa. February 1, 2016) to decide

*(Footnote Continued Next Page)*

trial court does not clarify this distinction in granting summary judgment. Pennsy Supply raised defenses to both theories, claiming the concrete does not have a design defect and asserting that it gave adequate warnings of the dangers of concrete. As a result, we will address both theories of liability.

The law governing strict products liability actions in Pennsylvania has been developed based upon the principles outlined in Section 402A of the Second Restatement of Torts, which provides as follows:

> **§ 402A Special Liability of Seller of Product for Physical Harm to User or Consumer**
>
> (1) One who sells any product in *a defective condition unreasonably dangerous to the user or consumer* or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>
>> (a) the seller is engaged in the business of selling such a product, and
>>
>> (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
>
> (2) The rule stated in Subsection (1) applies although
>
>> (a) the seller has exercised all possible care in the preparation and sale of his product, and

*(Footnote Continued)* ────────────

"[w]hether, under the Court's recent decision in ***Tincher v. Omega Flex, Inc.*** 628 Pa. 296*,* 104 A.3d 328 (Pa. 2014), a defendant in a strict-liability claim based on a failure-to-warn theory has the right to have a jury determine whether its product was "unreasonably dangerous?" However, on November 22, 2016, the Supreme Court dismissed the appeal as improvidently granted. ***Amato v. Bell & Gossett***, ___Pa.___, ___ A.3d ___, 2016 WL 6873043 (Pa. November 22, 2016).

> (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Restatement (Second) of Torts, § 402A (1965) (emphasis added) (adopted in **Webb v. Zern**, 422 Pa. 424, 220 A.2d 853 (1966)). We recognize that in its recent decision in **Tincher**, our state Supreme Court explicitly declined to move Pennsylvania products liability theory from the Second Restatement construct to adopt the Restatement (Third) of Torts. **Tincher**, 628 Pa. at 415, 104 A.3d at 399.

The **Tincher** Court significantly altered the common law framework for strict products liability claims in Pennsylvania by overruling its precedent in **Azzarello v. Black Brothers Co.**, 480 Pa. 547, 391 A.2d 1020 (1978). In **Azzarello**, the Supreme Court created a distinct divide between strict liability and negligence claims, by suggesting that negligence concepts have no place in Pennsylvania strict liability doctrine. Specifically, the **Azzarello** Court had deemed the phrase "unreasonably dangerous" to be negligence rhetoric that would mislead jurors in a strict liability case. Although the Supreme Court reasoned that a jury was permitted to determine whether the product was defective or to resolve any "dispute as to the condition of a product," the Supreme Court established that the threshold question of whether a product was unreasonably dangerous was to be determined by the trial court. **Id**. at 556, 391 A.2d 1025.

The ***Tincher*** Court rejected this standard set forth in ***Azzarello*** as confusing and impracticable, and "incompatible with the basic principles of strict liability," explaining as follows:

> First, the notion that a legal inquiry into "whether that condition justifies placing liability upon the supplier" (product is unreasonably dangerous) is, albeit distinguishable, entirely separable from a factual inquiry into the predicate "condition of a product" (defective condition of product) when determining whether to affix liability upon a supplier is incompatible with basic principles of strict liability. In a jurisdiction following the Second Restatement formulation of strict liability in tort, the critical inquiry in affixing liability is whether a product is "defective"; in the context of a strict liability claim, whether a product is defective depends upon whether that product is "unreasonably dangerous." Yet, ***Azzarello*** divorced one inquiry from the other: under the ***Azzarello*** scheme, the trial court serves as the gate-keeper of one question with the apparent task of deciding as a matter of law and policy whether a product is one even susceptible to a strict liability claim. As a practical matter, the ***Azzarello*** decision did not indicate at which point of the trial the court should consider the question, nor what pleadings or evidence would be relevant to the inquiry; the Court did suggest, however, that the matter "d[id] not fall within the orbit of a factual dispute." [***Azzarello***, 480 Pa. at 558,] 391 A.2d 1026.
>
> Second, the practical reality, as exemplified by the matter before us, is that trial courts simply do not necessarily have the expertise to conduct the social policy inquiry into the risks and utilities of a plethora of products and to decide, as a matter of law, whether a product is unreasonably dangerous except perhaps in the most obvious of cases (*e.g.,* where injury is caused by a knife), where a gate-keeper's function is hardly necessary.

***Tincher,*** 628 Pa. at 382-83, 104 A.3d at 380. Accordingly, the ***Tincher*** Court concluded that the question of whether a product is in a defective condition unreasonably dangerous to the consumer is a question of fact that

should generally be reserved for the factfinder, whether it be the trial court or a jury.

After overruling **Azzarello**, the **Tincher** Court was tasked with filling the gap in our strict liability jurisprudence. The Court first clarified that "a person or entity engaged in the business of selling a product has a duty to make and/or market the product ... free from a defective condition unreasonably dangerous to the consumer or [the consumer's] property." **Id**. at 388, 104 A.3d at 383. In order to demonstrate a breach of this duty, the Court provided that a plaintiff must show the seller placed on the market a product in a "defective condition." **Id**. at 389, 104 A.3d at 384.

In order to prove a product is in a "defective condition" in the context of a design defect claim, the Supreme Court set forth two alternative standards: (1) the consumer expectations standard (whether the danger of the product is "unknowable and unacceptable to the average or ordinary consumer"), or (2) the risk-utility standard (whether "a reasonable person would conclude that the probability and seriousness of harm caused by the product outweighs the burden or costs of taking precautions"). **Id**. at 309, 104 A.3d at 335. The Supreme Court clarified that "[t]he burden of production and persuasion is by a preponderance of the evidence." **Id**. Further, the Court clarified that it was establishing a "composite standard" that allows a plaintiff to present proof, in the alternative, of either the ordinary consumer's expectations or of the risk-utility of a product. **Id**. at 417, 104 A.3d at 401. As noted above, "[w]hether a product is in a

defective condition is a question of fact ordinarily submitted for determination to the finder of fact; the question is removed from the jury's consideration only where it is clear that reasonable minds could not differ on the issue." *Id*. at 309, 104 A.3d at 335.

Although the trial court in this case found that the High brothers failed to show a defective condition under both the consumer expectations and risk-utility standards, the High Brothers solely focus their efforts on showing they presented sufficient evidence to allow a jury to conclude that wet concrete is unreasonably dangerous under the consumer expectations test. The *Tincher* Court outlined the consumer expectations test as follows:

> The consumer expectations test defines a "defective condition" as a condition, upon normal use, dangerous beyond the reasonable consumer's contemplations. The test offers a standard of consumer expectations which, in typical common law terms, states that: the product is in a defective condition if the danger is unknowable and unacceptable to the average or ordinary consumer. The test has been described as reflecting the "surprise element of danger."
>
> The product is not defective if the ordinary consumer would reasonably anticipate and appreciate the dangerous condition of the product and the attendant risk of injury of which the plaintiff complains (*e.g.,* a knife). The nature of the product, the identity of the user, the product's intended use and intended user, and any express or implied representations by a manufacturer or other seller are among considerations relevant to assessing the reasonable consumer's expectations.

*Id*. at 394–95, 104 A.3d at 387 (internal citations omitted).

The Supreme Court formulated the consumer expectations standard based upon the commentary found in Section 402A of the Second

Restatement, which provides further analysis of the phrase "unreasonably dangerous" in comment i:

> *i. Unreasonably dangerous.* The rule stated in this Section applies only where the defective condition of the product makes it unreasonably dangerous to the user or consumer. Many products cannot possibly be made entirely safe for all consumption, and any food or drug necessarily involves some risk of harm, if only from over-consumption. Ordinary sugar is a deadly poison to diabetics, and castor oil found use under Mussolini as an instrument of torture. That is not what is meant by "unreasonably dangerous" in this Section. The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics. Good whiskey is not unreasonably dangerous merely because it will make some people drunk, and is especially dangerous to alcoholics; but bad whiskey, containing a dangerous amount of fuel oil, is unreasonably dangerous. Good tobacco is not unreasonably dangerous merely because the effects of smoking may be harmful; but tobacco containing something like marijuana may be unreasonably dangerous. Good butter is not unreasonably dangerous merely because, if such be the case, it deposits cholesterol in the arteries and leads to heart attacks; but bad butter, contaminated with poisonous fish oil, is unreasonably dangerous.

Restatement (2nd) of Torts, § 402A, comment i.

In this case, the trial court reasoned the High Brothers could not prove Pennsy Supply delivered a product in a "defective condition" under the consumer expectations test as they failed to show the danger of wet concrete was unknowable and unacceptable to the average or ordinary consumer. After noting there is no Pennsylvania precedent considering whether wet concrete is unreasonably dangerous as a result of its caustic nature, the trial court relied on decisions from other jurisdictions to reach its

finding that "the caustic properties of concrete are common knowledge and not subject to liability."  Trial Court Opinion (T.C.O.), 2/18/16, at 3 (citing **Katz v. Arundel-Brooks Concrete Corp**., 220 Md. 200, 151 A.2d 731 (1959); **Simmons v. Rhodes & Jamieson, Ltd.**, 46 Cal.2d 190, 293 P.2d 26 (Cal. 1956); **Dalton v. Pioneer Sand & Gravel Co.**, 37 Wash.2d 946, 227 P.2d 173 (Wash. 1951)); **Gary v. Dyson Lumber & Supply Co.**, 465 So.2d 172 (La.Ct.App. 1985); **Huff v. Elmhurst-Chicago Stone Co.**, 419 N.E.2d 561 (Ill. App. 1981); **Baker v. Stewart Sand & Material Co.**, 353 S.W.2d 108 (Mo.Ct.App. 1961)).

On appeal, the High brothers argue that the trial court's grant of summary judgment conflicts with **Tincher** as the trial court removed the question of whether the product was "unreasonably dangerous" from the province of the jury.  The High brothers challenge the trial court's reliance on case law from other jurisdictions to reach its finding that the caustic properties of concrete are common knowledge and not subject to liability. **See Gray**, **supra**; **Katz**, **supra**; **Huff**, **supra**; **Baker**, **supra**; **Simmons**, **supra**; **Dalton**, **supra**.  In response, the High brothers cite to several decisions in which other jurisdictions have found that the dangers of concrete are not common knowledge to the average consumer.  **See Jowers v. Commercial Union Ins. Co**, 435 So.2d 575 (La.Ct.App. 1983) (finding seller of concrete liable for its failure to warn of the dangerous propensity of wet concrete as "the ordinary "do-it-yourself" home improver would have no knowledge of the burn risk of wet concrete"); **Young v.**

*Elmira Transit Mix*, *Inc*., 52 A.D.2d 202 (N.Y.App.Div. 1976) (affirming judgment against concrete supplier in negligence for failing to warn a "do-it-yourself" consumer who "would not know that concrete is dangerous by looking at it"); *Sams v. Englewood Ready-Mix Corp.*, 259 N.E.2d 507 (Ohio Ct.App. 1969) (reversing trial court's decision to sustain concrete supplier's demurrer in negligence action, stressing that "the caustic and corrosive qualities of concrete" are not "matters of common knowledge so as to relieve defendants of a duty to warn").

Pennsy Supply argues that the trial court properly granted summary judgment in its favor, echoing the trial court's rationale that the High brothers could not prove the concrete was defective under the consumer expectations standard as the danger of concrete's high pH was knowable and acceptable to the average person. The Pennsylvania Aggregates and Concrete Association has filed an *amicus* brief including the same arguments raised by Pennsy Supply, adding that the trial court's decision is in accordance with public policy as the "utility of concrete far outweighs the risks associated with its use." Amicus Brief, at 9.[3]

---

[3] Pennsy Supply does not argue that the High brothers should have been required to prove that concrete is defective under the risk-utility standard articulated in *Tincher*. As noted above, the Supreme Court adopted a composite standard allowing a plaintiff to present proof, in the alternative, of either the consumer expectations standard or the risk-utility standard.

After reviewing the record, we agree that the trial court erred in entering summary judgment based on its finding that concrete is not defective after finding that "the caustic properties of concrete are common knowledge and not subject to liability." T.C.O. at 3. Rather, we find a genuine issue of material fact exists as to whether an ordinary consumer would reasonably anticipate and appreciate the dangerous condition of concrete and the attendant risk of injury. The trial court's recitation of case law supporting its finding does not convince us that the entry of summary judgment was proper as the High brothers have presented case law from other jurisdictions that have reached the opposite conclusion.[4] *See Jowers*, *supra*; *Young*, *supra*; *Sams*, *supra*.

Further, while the trial court based its conclusion on the aforementioned rationale, it failed to address any of the factors set forth under the consumer expectations standard, namely, "the nature of the product, the identity of the user, the product's intended use and intended user, and any express or implied representations by a manufacturer or other

---

[4] While the High brothers have identified case law holding that the caustic nature of concrete is not common knowledge to the average consumer, we note that none of the cases cited involve design defect claims, but impose liability through a failure to warn theory. However, the High brothers also cite to *Netzel v. State*, 186 N.W.2d 258 (Wis. 1971), in which the Wisconsin Supreme Court found that the plaintiff had presented sufficient evidence to allow a jury to decide whether the concrete delivered by a supplier had an unreasonably dangerous defect when eight workers were burned by the concrete on the same day.

seller." ***See Tincher***, ***supra***. For example, while the High brothers' defect claim centers on the danger posed by the high pH of concrete, the trial court did not discuss the expert testimony submitted by Pennsy Supply discussing the nature of concrete.[5] Moreover, the trial court did not offer any discussion of the product's intended use or intended user and did not discuss any of the express or implied representations made by Pennsy Supply to the High brothers.

As stated above, in reviewing a motion for summary judgment, "the trial court must resolve all doubts as to the existence of a genuine issue of material fact against the moving party, and, thus, may only grant summary judgment where the right to such judgment is clear and free from all doubt."

_____

[5] In support of its motion for summary judgment, Pennsy Supply attached the report of Dr. Barry E. Sheetz, Ph.D., an expert in geochemistry and civil engineering, who thoroughly explained that when dry concrete is mixed with water, the hydration process produces calcium hydroxide, which in turn raises the pH of the concrete. Specifically, Dr. Sheetz opined:

> The concrete purchased by the plaintiff is a routine formulation that complies with industrial ASTM standards. The chemical reactions that took place in the concrete once water was added and the mixture begins the hydration process contains nothing out of the ordinary from the millions of cubic yards of cement that are manufactured and placed each year in the United States. On the contrary, if the pH of this mixture would not reach values in excess of 11.5, the physical and mechanical properties that the plaintiff desired in the end product would not have been achieved.

Scheetz expert report, 6/23/15, at 4-5.

*Allen-Myland, Inc.*, *supra*. The determination of whether the concrete was in a defective condition unreasonably dangerous to the consumer should have been left to the jury to decide as reasonable minds can clearly disagree on this issue. Accordingly, we conclude that the trial court erred in granting summary judgment to Pennsy Supply on the High brothers' design defect claims.

Moreover, as previously mentioned, the High brothers' arguments can be construed to raise a strict liability claim under the theory that the concrete delivered was defective as Pennsy Supply failed to adequately warn them of the inherent danger of concrete to cause severe burns. Our Supreme Court has held that "[a] product is defective due to a failure-to-warn where the product was distributed without sufficient warnings to notify the ultimate user of the dangers inherent in the product." *Phillips v. A-Best Prod. Co.*, 542 Pa. 124, 131, 665 A.2d 1167, 1171 (1995). A plaintiff can show a product was defective under this theory by showing that "a warning of a particular danger was either inadequate or altogether lacking, and that this deficiency in warning made the product 'unreasonably dangerous.'" *Id*.

Although this specific theory of liability appears to be the exact formulation of the High brothers' argument in this case, it is not clear from the record if either plaintiff is pursuing this claim. We also note that while Charles High's claims are largely based on Pennsy Supply's failure to inform him that concrete can cause severe burns, he stated in his brief on appeal

that "the case at bar is not based upon the failure to warn, that theory." Appellate Brief for Charles High, at 32. The trial court does not discuss the High brothers' challenge to the representations and warnings made by Pennsy Supply through its representatives. To the extent that the High brothers have properly raised a failure-to-warn theory in the trial court, we remand for the trial court to resolve these claims.

For the foregoing reasons, we conclude that the trial court erred in granting Pennsy Supply's motion for summary judgment.

Order reversed. Remand for further proceedings consistent with this decision. Jurisdiction relinquished.

PJE Ford Elliott has joined the Opinion.

Judge Shogan files a Concurring and Dissenting Opinion.

Judgment Entered.

_Joseph D. Seletyn, Esq._
Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/13/2017

- 21 -